Palmore vs. The State.

---

PALMORE vs. THE STATE.

1. CONSTITUTIONAL LAW: *The right of objecting to the qualification of grand jurors.*

The provisions of sec. 1978, Gantt's Dig., prohibiting exceptions to the rulings of inferior courts, in refusing to set aside an indictment for a defect in the formation of the grand jury, is unconstitutional. The legislature may prescribe the time and manner of determining objections to the qualifications of jurors, but it cannot take away the right of objecting.

2. GRAND JURORS: *Qualification of.*

It was not necessary, under the provisions of sec. 3654, Gantt's Dig. that grand jurors should be householders or freeholders.

3. CRIMINAL PRACTICE: *Form of oath for petit jury.*

The oath prescribed for the petit jury by sec. 219, Crim. Code, is not in violation of the constitution; it in effect requires the jury to try the the case according to the law and the evidence.

Palmore vs. The State.

4. — *Irregular and improper conduct of petit jury.*

During the deliberations of the petit jury, in a trial for murder, they should not be permitted to separate, or to indulge in the use of liquor, or to read a newspaper containing improper comments on the trial of the case before them, nor should the defendant or his counsel be called on to consent to such irregularities, as a refusal might incense the jury; but where the court below, with a knowledge of the facts and circumstances, and of the habits and character of the jurors, refuses to set the verdict aside on account of such irregularities, this court will not do it.

5. EVIDENCE: *When threats, and the character of the deceased admissible.*

Threats, and the character of the deceased are admissible, when they tend to explain or palliate the conduct of the accused. They are circumstantial facts, and a part of the *res gestæ* when so connected with the conduct of the parties as to explain their motives.

6. CRIMINAL LAW: INSTRUCTIONS: *As to what constitutes the crime of murder.*

It is not the intention to use a deadly weapon, but the intention to kill, of which the use of the weapon is evidence, that constitutes the crime of murder; and this distinction should be made clear to the jury in the instruction on this point.

7. — *Same.*

The court should define to the jury the difference in the degrees of homicide; but the failure to do so will not be ground for reversal where the court read from the statute the definition of the different degrees of murder.

8. — *Same.*

An instruction, that where a deliberate purpose to kill, or do great bodily harm, on the part of the defendant, appeared, followed by an unlawful killing, the provocation which immediately preceded must not be considered, unless the defendant showed that the purpose was abondoned before the killing; should be accompanied by an explanation of the degrees of homicide, and so guarded as to allow the jury to infer the abandonment of the purpose to kill, from the circumstances of the homicide.

9. — *Same. When obscure.*

Where an instruction is vague and obscure, but not misleading, this court will not hold it erroneous.

10. — *Malicious killing.*

A malicious killing is not necessarily murder in the first degree; it must also be willful, deliberate and premeditated, or committed in the attempt to commit some one of the felonies described in the statute.

11. — *Reasonable doubt defined and explained.*

By a reasonable doubt it is not intended to exclude every mere possible doubt. Where the jury, after consideration and comparison of all the evidence, are satisfied to a moral certainty, of the truth of the charge, they may convict.

12. — *Self defense.*

To excuse homicide, it must appear that the danger is not only impending, but so pressing and urgent as to render the killing necessary; and that the slayer really acted under the influence of such fears as a reasonable person might entertain, and not in a spirit of revenge. The circumstances of the rencontre, the situation of the parties at the time, their threats and their relative strength, should be considered by the jury.

13. — *Same. Instruction upon.*

An instruction, that if the deceased by his manner and words manifested an intent, coupled with acts, to kill or inflict bodily harm upon the defendant, and immediately sought to carry the purpose into effect, the defendant, if in the reasonable fear of such consequences, was justified in taking life: *Held*, too general and unqualified.

14. INSTRUCTIONS: *How tested.*

In testing an instruction, every deduction that the jury might have made from the evidence is to be taken as having been proven.

15. EVIDENCE: *Burden of proof, instruction, etc.*

Where the killing is proved, the burden of proving circumstances that justify or excuse the homicide devolves upon the accused, unless they are developed by the proof on the part of the state, or it is manifest that the offense only amounted to manslaughter. An instruction to this effect, however, should be accompanied by a definition of the degrees of homicide.

16. INSTRUCTION: *When it need not be in writing.*

The reading of a section of the digest to the jury, as an instruction, is a sufficient compliance with the law requiring it to be in writing.

Palmore vs. The State.

17. CRIMINAL PRACTICE: *What papers should be excluded from the jury.*
The jury should not be permitted to take with them, when they retire, papers containing statements bearing on the case, which were not read in evidence. But where the paper taken is the appellant's motion for continuance, containing a statement of the facts he expects to prove, it cannot be prejudicial to him.

APPEAL from *Phillips* Criminal Court.
Hon. CHARLES C. WATERS, Judge.
*T. B. Hanley* and *Palmer & Sanders*, for appellent.
*S. P. Hughes*, Attorney General, *contra*.

WILLIAMS, Sp. J. The appellant was indicted in the criminal court of Phillips county, for murder of one Meyers. He filed his motion to set aside the indictment, on the ground that two members of the grand jury that found the indictment were not freeholders or householders. To this motion the state demurred, the court sustained the demurrer, and appellant excepted.

Section 1978 of Gantt's Digest prohibits all exceptions to the ruling of inferior courts in refusing to set aside an indictment for certain causes, among others this. This section violates the provision of the constitution of 1868, section 9, article I., which requires a presentment or indictment by a grand jury, before the accused can be called to answer for such a crime as this. While the legislature may prescribe the time and manner of determining the objection for the want of qualification of jurors (*Whitehead v. Wells, ante,* p. 99), it cannot take away the right to make it.

The objection is here made in apt time, and the right of appeal cannot be taken away as to any important right. Constitution of 1868, secs. 4 and 15, art. VII; *Simpson v. Simpson,* 25 Ark., 489. It was not necessary that the members of the

grand jury should be householders or freeholders. Gantt's Digest, sec. 3654. This section is not obnoxious to the constitutional objection interposed by appellant, for the act of 1871, from which this section was taken, does not conflict with sections 22, 23, art. V, Constitution of 1868, by embracing more than one subject, and in failing to copy the law, revised or altered, entire. The constitution required singleness of subject, to prevent omnibus bills, by which various distinct schemes could be united in one bill, and the like, and the friends of separate measures be thus united to carry through measures which, alone, could not be passed. It was not intended to require that minute separation of subjects as is here claimed. Neither does it conflict with said section 23, art. V of the constitution; the object of which was to prevent that system of amendments, which, instead of inserting the amendment or alteration, together with so much of the old law as was retained, provided, in terms directory, that a given law should be amended as follows, to wit: in a given section or line, strike out given words and insert others, leaving the court, by this direction, to make the amendment itself and make a new law out of the two. This constitutional provision intends to check all that kind of legislation, and requires the legislature to give us, in the old and the new put together, what the new law is intended to be. By these rules it is easy to see that this provision of the act of 1871 is perfectly constitutional; none of the old sections was wanted, hence none is retained. It is expressly repealed, or by implication, by the inconsistency of the new section. The subject is sufficiently embraced within the title. There is nothing in this exception.

After the demurrer was sustained to appellant's motion in abatement of the indictment, and he had thus excepted, he waived arraignment and pleaded not guilty, and the cause was continued until the fall term; at which time the case was tried,

and the appellant convicted of murder in the first degree, and sentenced to be hung. During the progress of the trial appellant excepted to sundry rulings and decisions of the court, and moved for a new trial, setting up twenty-four grounds for new trial. This motion was overruled by the court, and a bill of exceptions was signed and made part of the record, which set out all the testimony given, and offered to be introduced by either party, and the instructions of the court and affidavits in support of the motion for a new trial.

The record states that the jury were duly drawn, selected and sworn as required by law, the oath administered being the one prescribed by section 219 of the criminal code of practice. This method of swearing the jury is made one of the grounds of the motion for new trial, and this provision, it is here argued, is unconstitutional in failing to swear the jury to try the case according to law and evidence. The oath is as follows: "You and each of you do solemnly swear that you will well and truly try the case of the state of Arkansas against W. B. Palmore, and a true verdict render unless discharged by the court, or withdrawn by the parties," etc. The jury are the judges of both law and fact, and were so informed. It would be difficult for them to well and truly try and a true verdict render, without acting according to law and evidence. There is nothing of substance in this objection.

The record shows that the court ordered the jury to be kept together, and put them in charge of an officer during the progress of the trial, and pending their deliberations there were serious acts of misconduct of the jury, and irregularities were permitted on the part of the officer having the jury in charge, in permitting them to drink intoxicating liquor, and in allowing one Jackson to separate from his fellow jurors, to go into a kitchen at a restaurant to eat by himself, and in allowing one of the jury to separate from his fellows, and go away from

them, and out of sight of the officer in charge, to see a man at his office on business, and in allowing the opportunity for the jury to read a newspaper containing highly improper comments upon the case before them; which article asserted that the prisoner had been proven guilty of murder, by the state's witnesses, and from their respectability and standing this evidence would be hard to overcome.

This comment is such as no prudent press should make pending a trial of this kind, and such as the court should have, perhaps, prevented the repetition of by punishing the publisher for contempt; at least, it was not proper to have come before the jury, as the affidavits strongly tended to show it did.

There is an affidavit tending to show that four of the jury went, by permission of the court and consent of prisoner's counsel and the state's, to attend a theatrical exhibition, while the eight others remained in charge of another officer; but no communication was had by the four with any one. This was a serious irregularity, and was very improper. Neither defendant below nor his counsel should have been asked favors of this kind, for his refusal might have incensed the jury. But the court should not have permitted the jury to be subjected to any influences calculated to lessen the solemn obligation they were under to perform the gravest duty which man on earth can be called on to perform — decide upon the life of his fellow. This, outside of the opportunity and temptation to communicate and hear comments upon the case before the jury, was wrong. The jury having, during this separation, been, each part of it, in charge of a sworn officer, and no communication being proven, we would not disturb the verdict for this alone.

The drinking of intoxicating drinks, although it is shown to be in limited quantities, was very improper, and is more aggravated by the statement of the officer, that he cautioned the

barkeeper — a public barkeeper at a restaurant — to limit the quantity drank, although the affidavits show that the use was limited and moderate, confined principally to two feeble old men in the jury, who, it was thought, needed it. The use of any ardent spirits in such manner as is shown here is a gross irregularity. For even if a case should occur where stimulants would become absolutely necessary to any person, the administration of them should not be left to the discretion of a barkeeper in a public saloon.

This court has not favored the setting aside of a verdict for mere separation, unless something more than opportunity for undue influence is shown. *Cornelius v. The State*, 12 Ark., 782; *Coker v. The State*, 20 id., 53; *Collier v. The State*, id., 36; *Staunton v. State*, 13 id., 320.

The facts attending the homicide, as detailed by the witnesses, are substantially as follows:

L. H. Mangum testified: I live in Helena; the killing took place on my plantation last summer, one Sunday in May, in the evening, about three o'clock. Ellis and son came to take dinner with me; after dinner, Meyers and I proposed riding towards home with Ellis. Meyers had gone to the horse lot to saddle our horses, and prisoner rode up. Ellis and I were on the gallery; prisoner came up and spoke; I asked him to get down; he said no, he wanted to see me; he then crossed on the opposite side of the lane and stopped; he then said: Judge Mangum, I think a great deal of you; that damned fellow, Meyers, I understand, has told you that I said you were a damned grumbling scoundrel; but I want to tell you that I did not say it. I told him that Meyers had never intimated anything of the kind to me. Then he said: well, anyhow, he is going to cowhide me. I asked him for what, and he said, about hiring that nigger, George. I told him I did not think so, as he, Palmore, had acknowledged to Meyers

that he had done him injury in that matter. He then said: Well, it was about that Dolly Varden, meaning a negro woman. I told him it could not be that, as Meyers knew that I would not let her stay on my place ten minutes. Well, said he, anyhow, he is going to cowhide me, and I came up here to-day prepared to take it. Said I, Palmore, who told you that Meyers intended to cowhide you? and he said, Jim Taylor told me so, and that he (Taylor) would give Meyers $500 to deny it. About that time, Jim Taylor and Pink Harris came riding up the lane in the direction that defendant had come. As Taylor came up, Palmore introduced him to me. I said, Mr. Taylor, did you tell Mr. Palmore that Meyers had threatened to cowhide him? Taylor then said to Palmore: No, I did not tell you that. Palmore then said: Well, what did Meyers say? Taylor then said: You know what I told you; and then I remarked that Meyers had said that Palmore was a damned liar, if he had said certain things about the hiring of George. I then asked him to go away; this is no time or place for a difficulty. Taylor was very much embarrassed, and looked pale and uneasy. Taylor and Harris then rode down toward the horse lot gate. Palmore got down and tied his mule.   *   *   *   I told defendant to get off my place and not to have a difficulty. He said: Judge, it is mighty hard to be threatened to be cowhided, and I have come to take it. Meyers was coming up the lane from the lot, leading two horses. Meyers said: I am responsible for what I have said, and hitched his horses. Palmore said: I have come to take that cowhiding you promised me. Meyers said: Palmore, I never threatened to cowhide you. Palmore said: Well, G—d d—n you, why don't you do it? Palmore then advanced on Meyers, with his right hand behind, on his hip, and Meyers picked up an ox bow; and I don't know whether he struck before Palmore drew his pistol or not, but he struck Palmore,

Palmore vs. The State.

and he, Palmore, fired, and shot Meyers in the arm; he then fired again, and struck him in the bowels. Meyers said: Judge, he has killed me; he has shot me in the bowels. He, Meyers, then pushed Palmore over, and took the pistol away from him, and carried it into the house. Palmore said: Judge, don't let him kill me. Meyers then went toward the house, and defendant again requested witness not to let Meyers kill him, and said he was willing to give himself up to him. I told him I thought he had killed the man, and he had better stay and see what the consequence was. Meyers was then taken into the house and defendant went off. I did not see him after that.

Meyers lived until next day at 12 o'clock, when, the proof shows, that he died of the wound.

Mangum, in cross examination, stated that he did not know whether Meyers drew the ox bow before Palmore drew the pistol, or not. This ox bow is proven by other witnesses to have been an old ox bow, untrimmed, about three-fourths straightened out, and was about five feet long; and that Meyers struck with both hands, advancing on Palmore to do so. Deceased was Mangum's superintendent.

Mangum further stated that the parties clenched and struggled after the pistol was fired the first time. He did not suspect a difficulty until it was too late to prevent it. The second shot was fired while they were clutched and struggling, when deceased threw defendant down, and got up holding Palmore's pistol in his hand. This happened on the usual traveled neighborhood road, in front of Mangum's plantation house, in Phillips county.

Other witnesses proved that defendant was passing on this occasion on proper business, having gone by in the morning after his clothes, which were at Robson's store, and was returning.

Anderson Ellis details the circumstances immediately attending the killing — among other matters, as follows: Meyers came up and hitched his horses, having heard Palmore say that if he was to be cowhided, he wanted it done then. Witness thought that Palmore acted as though he were drunk. Meyers said to Palmore, I never threatened to cowhide you; go away from here; I do not want a difficulty with you; Meyers raising his hand and motioning away, saying, I am responsible for what I say. Palmore was then advancing on him, saying, G—d d—n you, why don't you cowhide me if you are going to? repeating it several times: Meyers stooped down and picked up a broken ox-bow and struck him (Palmore) a lick with both hands, and according to my observation the lick only brushed Palmore and did not take effect on him. As Meyers struck Palmore, almost simultaneously I heard the report of the pistol, and a second afterwards another. I ran out and they were clutched, and Meyers got up with the pistol in his hand and said that he was killed.

John Ellis, a son of the last witness, among other things, states, that Taylor asked Palmore to come and go home, when Meyers was in the barnyard getting the horses. He, Palmore, said, No, if I am going to be cowhided, now is as good a time as any. Palmore then had his hand back towards the right hip. I remarked to my father that I thought he had a pistol. He asked me, why? I told him that the day before, I saw him with a pistol. Meyers came out of the lot and was going to hitch the horses, and said to Palmore, you had better leave here. Palmore said, here I am, G—d d—n you, why don't you cowhide me? Meyers hitched the horses with his left hand, turned his face toward the house and caught hold of the end of an ox-bow, which was under the fence with his right hand, and said, I want you to leave here; I don't want to have any difficulty with you. I saw Palmore

advance towards Meyers a step or two, saying, G—d d—n you, why don't you cowhide me? several times. Meyers said, I never said I was going to cowhide you, but I am responsible for all I have said. Meyers said, I want you to leave here. He then raised the ox-bow with both hands, the left hand in front; when he brought his hands down I saw smoke, and thought he had knocked the dust out of Palmore's hat; he had the ox-bow in his hands, but the crack of the pistol the next instant showed me that the smoke was from the pistol. I don't know whether Meyers struck him or not, he made a motion to strike before the pistol fired, and I don't know whether he struck Palmore before or after the pistol fired, or whether he struck him at all, or not. After the report of the pistol, Meyers caught hold of Palmore. While they were struggling I heard another report. I saw the pistol in Palmore's hands just about the time Meyers took hold of him. They both got on the ground in the struggle, and when Meyers got up he had the pistol in his left hand, with the barrel of the pistol towards himself. Judge Mangum was standing close to Meyers. Palmore then ran off a few steps, and hallooed, Don't let him shoot me, twice. The blood was running from Meyers freely then. He put his hand on his stomach, and said, Oh, I'm killed; I'm killed. Judge Mangum told him to come into the house, which he did.

Palmore shortly after, in the manner detailed by this witness, got his pistol from the elder Mr. Ellis and rode off on his mule, flourishing it over his head, saying, He cowhided me, did he?

Pink Harris, for defendant, testified: That Palmore was talking to Judge Mangum about Meyers' threats to cowhide him; that Meyers came and hitched his horses and picked up the ox-bow after he had hitched the horses, and said to defendant: I will substantiate anything I have said; and said

further, G—d d—n you, get off this place, and popped defendant on the head. Defendant careened, but did not fall; he was in the "shape" of falling. At that time the pistol fired. I mean, after he, Meyers, had struck him. He, Myers, then struck Palmore again, and he fell, and Myers got on top of him, or astraddle of him. He was half bent when he was straddle of him. When he was half bent on Palmore, the pistol went off the second time.

This witness states that he and Jim Taylor and Palmore had gone down to Robson's store in the morning and back in the evening. That defendant lived at the Robb place, and had gone down that morning to Robson's for his clothes and a saddle he had there. They were coming back by Mangum's place in the evening when the difficulty occurred.

A. J. Taylor testified, on behalf of defendant, that he was present when the difficulty occurred, and after detailing the circumstances attending the interview between Mangum and Palmore, and about Meyers coming up, he says: Palmore turned around and asked Meyers if he had said that he intended to cow-hide him. Mr. Myers said, yes, and I'll substantiate what I said, picking up an ox-bow, at the same time, he advanced on defendant. Palmore stepped back and said, Meyers, don't hit me with that stick. When Meyers got up to him, he struck him a lick with both hands with the bow. Palmore staggered back, and as Meyers was in the act of striking him the second lick, defendant shot him. After he (M.) struck the second lick defendant fell, and the pistol fired the second time. Meyers then jumped on him. Mangum stepped up and caught Meyers by the shoulders, and Meyers raised up. Meyers said to Mangum, after he raised up, he has killed me, and turned round and walked into the house.

The witness says, Meyers struck with both hands. The ox-bow was four or five feet long, of pretty heavy size; it was in the shape of an ox-bow, a little crooked.

James Taylor testified that deceased was, to all appearance, a much stouter man than defendant, and was a man of active habits.

The defendant offered to prove that on the morning of the day of the homicide, James Taylor had told defendant that he, the deceased, had threatened to whip and cowhide the defendant on sight. This testimony, the court refused to allow to go to the jury, and would not let the witness, Harris, state it. Defendant excepted, and made this one of the grounds for his motion for a new trial.

The fact that defendant was armed with a deadly weapon, was a circumstance, if unexplained, that strongly tended to establish that malice aforethought and premeditation which were necessary to constitute the aggravated offense which the jury found here. Therefore, any motive of self-defense, or of protection against great bodily harm, or degrading chastisement by deceased, which might have prompted this hostile arming, was of the utmost importance for the jury to know. If the defendant armed to provoke the difficulty, in order to kill, he is guilty of murder. If his arming was in self-defense only, his crime, which his being armed with, and the use of a deadly weapon would greatly aggravate, might be palliated by showing a less guilty motive for having the weapon. This evidence, as well as that hereinafter named, showing other threats, and tending to prove the deceased to have been a turbulent, quarrelsome man, for the same reason, ought to have gone to the jury for what it was worth, they being the sole judges of its weight.

Threats, as well as the character and conduct of deceased, are admissible when these circumstances tend to explain or palliate the conduct of the accused. These are circumstantial facts which are a part of the *res gestœ* whenever they are sufficiently connected with the acts and conduct of the parties, so

as to cast light on that darkest of all subjects, the motives of the human heart.

This position is fully sustained, we think, by our own adjudications and those of other states. *Pitman v. The State*, 22 Ark., 354; *Coker v. The State*, 20 id., 53; *Atkins v. The State*, 16 id., 584.

In addition to this, defendant offered to prove, by one of the Taylors, the fact that divers threats were made by the deceased against the life and limb of the defendant, to be executed whenever he met him, and that these threats were communicated to the defendant shortly before the homicide. This was excluded by the court, and its ruling was duly excepted to and made one of the grounds of the motion for new trial. This was erroneous. The testimony should have been admitted. *Stokes v. The People*, 53 N. Y., 164; *Holler v. The State*, 37 Ind., 57; *Rector v. The People*, 19 Wend., 589; *Howett v. State*, 5 Geo., 54.

The defendant offered to prove, by witnesses named, that the deceased was "a violent, dangerous, quarrelsome and revengeful man." This testimony the court refused to permit the jury to hear, and defendant excepted. The court should have admitted this, as it tended to shed light upon the motives of the slayer, and the conduct of deceased at the time of the difficulty. 2 Whart. Cr. L., sec. 1099; *Phillips v. Com.*, 2 Duval, 328; 1 Metc., 370; 31 Miss., 504. The testimony may be of little value; the jury might give it but slight weight. No matter; the question for us is, Ought the jury, as a matter of law, to have been allowed to consider the fact? We think so. *Pitman v. State, ubi supra; State v. Keene*, 50 Mo., 357; *Hurd v. State*, 25 Mich., 405. This testimony was of more importance to defendant, in view of the slight conflict in the testimony as to which was the assailant, the deceased or the prisoner.

The rejection of evidence tending in any degree to aid the jury in determining a material fact is error. 3 J. J. Marsh., 229. It was perfectly competent for Harris to prove that Taylor had told appellant of the threat. The point of inquiry was not whether the threats were made, but what were Palmore's motives. The communication by Taylor to him was a fact in the case proving one of its circumstances. The truth of the message was not the question. *Cornelius v. The State,* 12 Ark., 782; *Atkinson v. The State,* 16 id., 568. But, in this case, if the slayer believed the threat, the character of the deceased was an important element in the case; for, if he was turbulent and revengeful, he would be more apt to execute his threats, and the appellant would be the more readily excused for preparing himself for defense in a more decided manner, and to act with more promptness and energy when he was assailed. If the jury should find that the deceased was the assailant, these facts, which were excluded from the jury, ought to be of the utmost importance. But the value and weight to be given to them are for the jury, not for the court.

The court gave seven instructions on the part of the state, numbered from 4 to 10 inclusive, to the giving of which appellant excepted.

The 4th is as follows: "If the jury believe from the circumstances that the accused intended to use a deadly weapon if the deceased assailed him, and provoked the deceased to strike him, and afterwards killed him, they will find the defendant guilty of murder."

This instruction may be good abstract law, which we doubt, but, connected with the facts of this case, should have been qualified by the words "intending to kill him, if he struck him," or something of like import after the words, "provoked the defendant to strike him." For, otherwise, the jury from the circumstances of this case, might have been led by the in-

struction to believe that the mere use of a deadly weapon was conclusive evidence that Palmore had committed murder, if they found that he provoked the assault, intending to use the deadly weapon. It is not the intention to use a deadly weapon, but the intention to kill, of which this use is evidence, which constitutes the offense. This should, under the circumstances of the case, have been made clearer to the jury than is done in this instruction, and the court here fails to define the difference in the degrees of homicide, which is not sufficiently remedied by other instructions. This failure to define the degrees of homicide is made the 22d ground of the motion for new trial. While this failure is, in every such case, improper, we would not for this alone reverse, especially as in the 24th ground for new trial and from the record, it is shown that the court read the definitions of the different degrees of murder from the digest. Article I, part 4, chapter 51, Gould's Digest. This was no error, and, being in print, complied with the law which requires instructions to be in writing.

The 5th instruction given for the state was: "If the jury believe from the evidence that defendant entertained a deliberate purpose to kill or do great bodily harm, and there is a consequent unlawful act of killing, the provocation, whatever it may be, which immediately preceded the act, is to be thrown out of the case, and goes for nothing, unless the defendant shows that the purpose was abandoned before the killing was done."

This instruction would have been unobjectionable if it had been qualified in itself, or in a separate instruction with an explanation of the degrees of homicide, except the last clause should have been so guarded as to allow the jury to infer the abandonment of the deliberate purpose to kill, if they so found from the circumstances of the homicide; otherwise, it might

have misled the jury to believe that the defendant must prove it from other evidence.

The 6th instruction is: "If the jury should believe from the evidence that the provocation was sought by the defendant, it cannot furnish any defense against the charge for a felonious homicide." This instruction is too vague as to what was meant by "provocation," and what was the meaning of "felonious homicide." The only objection to this is its obscurity, which we could not pronounce a decided error, unless it was misleading. See *Payne v. Com.*, 1 Met., 370.

The 7th instruction is law. It is: Express malice is that deliberate intention of mind unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

8. "Malice shall be implied when no considerable provocation appears, or where all the circumstances of the killing manifest an abandoned and wicked disposition; and the jury is instructed that if they believe from the evidence that the killing was malicious, and that the difficulty was brought on by defendant, no provocation, however great, will reduce the killing from murder to manslaughter." The only objection to this instruction is the failure, there or elsewhere, to define the distinction as given by law between the degrees of homicide. A malicious killing is not necessarily murder in the first degree. To find that, the jury must be satisfied beyond a reasonable doubt that the killing was willful, deliberate, malicious and premeditated (25 Ark., 405), or was committed in the attempt to commit some one of the felonies described in the statute. The premeditation must exist as a course deliberately fixed upon before the act of killing. *Bevens v. State*, 11 Ark., 455.

9. "The jury are the judges of the credibility of witnesses from the manner of testifying, their means of observation, and

their general conduct on the stand ; and if they should believe that any of the witnesses have sworn falsely to any material fact in the case, they are at liberty to discard the whole statement of the witness so testifying." This is law.

10. "The jury are instructed that a reasonable doubt is not a mere possible doubt, because anything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jury in that condition that they feel an abiding conviction to a moral certainty of the truth of the charge." There can be no reasonable objection to this.

The appellant asked the court below to instruct the jury as set forth in ten distinct propositions. The court refused to give the 5th, 6th and 8th.

The 5th is as follows: "Words will not, in law, justify an assault; wherefore, if the jury believe from the evidence that the defendant did use provoking language to the deceased, upon which the deceased assaulted the defendant in a manner to produce a reasonable apprehension in the mind of the defendant that he was in danger of great bodily injury, and that such danger was impending, he is justified in employing such means for the defense of his person as he reasonably deems necessary, and if pressed, may kill the assailant."

This instruction was properly refused. It was too broad and unqualified. To excuse homicide, it must appear that the danger is not only impending, but so pressing and urgent as to render the killing necessary (Gantt's Dig., sec. 1285 ; *McPherson v. State, ante,* 225); and the circumstances must show that there was sufficient to arouse the fears of a reasonable person, and that the party killing really acted under their influence, and not in a spirit of revenge. Gantt's Dig., sec. 1284.

The 6th instruction asked for by defendant is : "If the jury believe from the evidence that the killing was done in defense of an attack by the deceased, it is their duty in deciding upon the character of the defense to carefully examine and consider all the circumstances of the *rencontre*, the true situation of the parties at the time, their respective feelings and intentions as shown by their acts, their threats, and their relative strength and power ; because in a contest between a powerful individual and a weaker, the necessity of taking life in self defense will be more apparent and easily discoverable."

This instruction should have been given. In testing instructions, every deduction which the jury might have made from the testimony is to be taken as proved. *Phillips v. Com.*, 2 Duval, 328.

The 8th instruction of the defendant which the court refused to give, is : "If the jury believe from the evidence that defendant was on the route home, and called at Mangum's to correct a false report said to have been circulated by defendant about said Mangum, and to ascertain or demand of deceased if he had threatened to cowhide defendant, and that upon making such inquiry of deceased, the latter, by his manner and words, manifested an intent, coupled with acts, to kill or inflict bodily harm upon the defendant, and immediately sought to carry such purpose into effect, the defendant, in the reasonable fear of such consequences, was justified in taking life."

The latter part of this instruction is too general and unqualified, and was liable to the same objection which was given to his instruction No. 9, and the court below properly refused it.

The court, of its own motion, gave the following instruction : "The killing being proved, the burden of proving circumstances of mitigation that justify or excuse the homicide shall devolve on the accused, unless by the proof on the part of the prosecution, it is sufficiently manifest that the offense

committed only amounted to manslaughter, or that accused was justified or excused in committing homicide."

This is correct, being an exact copy of sec. 1252, Gantt's Dig., and was properly given. This instruction should have been accompanied with a full definition and explanation of the degrees of homicide.

The court read from Gould's Digest, chapter 51, part IV, article I. This was not excepted to at the time, and the point was lost; but having been made one of the grounds for motion for new trial, we will pass upon it. The objection to this is, that it was not in writing. The objection is not well taken. When a given and well defined section of a statute is read from the Digest as an instruction to the jury, it is sufficiently fixed, permanent and known, to come within the substantive terms of the law which requires it to be in writing; for in preparing a bill of exceptions, it is always conveniently accessible. In this bill of exceptions, it is simply referred to, and not inserted. Yet we know exactly what was read, and it tended to remedy some of the evils of the neglect to define the degrees of homicide, for this article does define the degrees of murder.

The 24th ground of the motion for new trial was that the jury were allowed to take with them when they retired to consider of their verdict, papers which had not been received as evidence in the case, to wit: the motion and affidavit of defendant to set aside the indictment and subpoenas issued for witnesses in this cause.

The jury should not take any paper which contains statements of facts bearing on the case, which was not read in evidence to them. The only paper above named which might have been objectionable on this ground was defendant's motion for a continuance. This is not prejudicial to appellant, being his own statement, and states the facts he expected to

Palmore vs. The State.

prove satisfactory to himself. All other papers named were harmless.

We find that grave errors were committed by the court, and that the jury acted with irregularity, although these irregularities alone would not be a sufficient cause for setting aside the judgment of the court below in overruling the motion for new trial, after the court below with all the facts and circumstances before it, and a personal knowledge of the habits and character of the jury, had refused to do so.

We might feel content to affirm were we satisfied that these errors did not contribute to the conclusion arrived at by the jury. Here we find a strong, outside public sentiment, hostile to the appellant, as indicated by the newspaper article. We find the jury so acting as to tend to unfit them for their grave duties, and in this condition subjected to this external hostile influence to the extent of opportunity, if nothing more. We find this jury have not been allowed to hear important testimony, necessary to the correct determination of the case, and that it was liable to be misled by instructions which were erroneous, and by omissions of the court.

It would be going too far to allow this, simply that crime might not go unpunished.

For these errors the judgment of the criminal court of Phillips county is reversed, and this cause is remanded to the circuit court of said county, to whose jurisdiction it now belongs, with instructions to grant a new trial, and proceed therein according to law, and not inconsistent with this opinion.

Hon. E. H. ENGLISH, C. J., did not sit in this case.