TINER *v.* STATE.

Opinion delivered December 7, 1914.

1. CRIMINAL PROCEDURE—OPENING STATEMENT—ASSISTING ATTORNEY.— The opening statement to the jury may, under Kirby's Digest, § 2374, be made by an attorney assisting in the prosecution.

2. EVIDENCE—RES GESTAE—HOMICIDE.—In a prosecution for homicide, evidence that deceased asked witness to see him past defendant's house, where deceased was killed a few moments later, is admissible, as part of the *res gestae.*

3. EVIDENCE—HOMICIDE—STATEMENTS OF DECEASED.—Evidence of statements of deceased, that he supposed one T. had threatened to kill him are admissible, when T. had been convicted of the murder, and in this prosecution admitted his guilt; this being a prosecution of defendant, T.'s son, for the same murder.

4. EVIDENCE—STATEMENT AGAINST INTEREST—TESTIMONY AT INQUEST— HOMICIDE.—In a prosecution for homicide, testimony of defendant, given voluntarily before a coroner's jury, is admissible as a declaration against interest, when he admitted his presence in the room from which defendant was shot, where at the trial for homicide it was the theory of the defense that he was not in the room at the time of the killing.

5. TRIAL—CONDUCT OF JURY—READING NEWSPAPER ARTICLE—HOMICIDE.— In a trial for homicide, an affidavit that a newspaper was found in the jury room, while the jury was considering its verdict, the paper containing an article on the conduct of juries in murder cases, will not be ground for the reversal of a judgment on conviction, in the absence of any showing that the article referred to the case before the jury, or that any member of the jury read the article.

6. CRIMINAL LAW—HOMICIDE—INTENT—PRESUMPTION.—The law presumes that a person intends the necessary and natural consequences of his acts, and when death results as a consequence the presumption is that there was an intention to kill; but there is no presumption of law that such killing is murder.

7. INSTRUCTIONS—ERRONEOUS PORTION.—Where a portion of a requested instruction does not state the law, it is not error to refuse the instruction.

Appeal from Randolph Circuit Court; *John W. Meeks,* Judge; affirmed.

This is the second appeal of this case. Appellant was convicted on the first trial of murder in the second degree and the case was reversed for errors committed. *Tiner v. State,* 110 Ark. 251. He was jointly indicted with his father Tom Tiner for the murder of John R. Davis, who was killed on the 24th day of September, 1912, while riding along the road by Tom Tiner's wine cellar, near Swartz postoffice, by two shots fired from the window of the cellar, one from a shotgun, and the other from a rifle, both taking effect in the side of the murdered man, the rifle shot wound being about the center of the wounds made by the shotgun charge, the bullets all ranging about the same direction.

At the beginning of this trial, the defendant made formal admission of the following facts:

*First.* That on the 24th day of September, 1912, at about 9 or 10 o'clock in the morning, one John R. Davis was riding in a westerly direction along the wagon road passing by the wine cellar and office of Thomas L. Tiner, near the Swartz postoffice, in this county, armed with a loaded shotgun and a loaded .38 caliber Smith & Wesson pistol.

*Second.* Defendant further admits that while said John R. Davis was opposite or nearly opposite said wine cellar and office, there were fired from said office two shots, one from a Krag-Jorgensen rifle.

*Third.* Defendant admits that immediately after the firing of said shots, the said John R. Davis fell from the horse he was riding to the ground.

*Fourth.* Defendant further admits that when other parties arrived at the spot where said John R. Davis had fallen to the ground, they found that the said John R. Davis was dead.

*Fifth.* Defendant further admits that upon examination of the body of said John R. Davis, it was found that a charge of shot had taken effect in his left arm, about

two or three inches below the shoulder, and in the 'left side, some of which shot had penetrated into the interior of his body.

*Sixth*. Defendant further admits that upon such examination there was also found that a ball from a large caliber rifle had taken effect in the left arm of said John R. Davis, at or near the place where the greater portion of the charge of shot had entered, and that said rifle ball had passed through said arm, through the body and out at the right side, just back of the scapula, and that the bone of the left arm, where the said charge had taken effect, was fractured.

*Seventh*. Defendant further admits that either of said wounds, the one produced by the shotgun, and the one produced by the rifle, would have produced instant death.

Most of the testimony introduced at this trial was the same as that in the trial of Tom Tiner, whose conviction was affirmed in the case of *Tiner* v. *State,* 109 Ark. 138.

James R. Hurn testified, detailing the following conversation had with deceased immediately before he was killed:

"On that morning John R. Davis came up to the postoffice from his son-in-law's. I says, "Hello, Uncle John, did you have a pretty good time? I see you have been out squirrel hunting." He says, "Yes, I had a pretty good time." He was sitting there on his nag, and I was splitting a little stovewood by a little stump that was there, and he sighed two or three times. He says, says he, "Uncle Jimmie, will you see me past the cellar this morning? I says, "Yes, I'll see you past there." He says, "I suppose Tom Tiner has threatened my life." I says, "I hadn't heard about it, seemed like you fellows were having a fine time." He says, "He has threatened my life and I want you to see me past there."

Deceased then started down the road and when he came to the wine cellar witness saw smoke coming out from the little house above the cellar, and he threw up

his arm and said, "Oh, Lord," and fell off the right side of his horse. "I could see the front door of the wine cellar at the time Davis asked me to see him by. I saw Dee Tiner there at the time, after the killing, about forty or fifty yards from the cellar, and going from it." Witness said he only heard one gun fired, and that he did not see the deceased throw up his left hand as if to fire his gun, that he had a single barrel, breech loading shotgun, had the breech of it on his arm and the muzzle on his stirrup. He never changed the position of it from the time he left me until he was shot. I kept my eye on him all of the time.

Tom Tiner stated in his deposition: "I am the father of the defendant. I shot and killed John R. Davis. I was sitting in my office working on my books, when I heard a horse, and upon looking up, saw Davis in the act of shooting at me with a shotgun. Just as he fired, I dropped down and picked up my shotgun and fired at Davis, then got my rifle and fired it at him. At the time of the shooting the defendant was not in the room. He was not present, neither did he in any way aid, abet or assist in the killing. Nor did he at any time, advise or encourage me in the killing. When Davis came up he was on horseback, think he had come to a halt when I saw him. My shotgun was standing at my side, and as soon as Davis fired at me, I fired at him with my shotgun. The rifle was setting in the door opening from room where I was, into the other room. As soon as I fired the shotgun, I dropped it and grabbed the rifle and fired it. Rifle had been in cellar for day or two. They kept the rifle a part of the time at Hamil and a part of the time at Swartz. Defendant brought the rifle from Hamil and handed it to me at my gate. I stayed at my office at the wine cellar on the Sunday night before Davis was killed on Tuesday, but was not there on the Monday night before he was killed. I kept the books for both my stores at my office in the wine cellar and stayed there the most of my time. I don't know when defendant first came to the wine cellar the morning Davis was killed, as members of my fam-

ily came. and went in and out all the time. Defendant
may have helped me some on my books that morning, but
had gone out, and I think he was working with some
grapevines near the cellar. He came in just after the
shooting. When the shooting was over, I turned 'round
and defendant was standing at the door. He was not in
the office or cellar when Davis came along. When I shot
Davis with the rifle, he fell from his horse.''

Marion Tiner testified: ''I am the mother of de-
fendant and the wife of Thomas L. Tiner, and remember
when my husband killed John R. Davis. At the time of
the shooting, I was sitting on the porch at my house in
full view of the road and wine cellar. I happened to look
up just as Mr. Davis fired his gun toward the wine cel-
lar. I didn't see him raise the gun, but saw him shoot.
Then I heard a gun from the cellar. I then saw the de-
fendant run back toward the cellar, and just as he got to
the cellar door, another gun fired. Defendant was back
in the vineyard ten or twelve steps from the cellar door
when the first shots were fired. I have talked to no one
about what I saw at that time, except my husband. I was
in attendance here as a witness at the former trial of the
defendant, but was not called to testify. I do not know
why I was not called.''

Other witnesses stated that there were three shots
fired, two in quick succession, the first report being that
of a shotgun and simultaneous with, or immediately after
it, a rifle report, and later a third report of a shotgun.
One witness, grand-son of James Hurn, stated that he
heard the first two shots fired together when he was get-
ting a bucket of water from the spring some distance from
the road, that he saw smoke and immediately ran back
toward the gate near which his grandfather, James Hurn,
was standing, and that he saw his uncle Tom Tiner out
in the road near the wine cellar raise his gun and shoot
toward the wine cellar. The following statement of de-
fendant's testimony at the coroner's inquest was read to
the jury over his objection: ''This morning we were in
the cellar and Pa was sitting at the window working on

some books. John Davis shot the first shot at Pa. Then Pa got the shotgun and shot at John Davis with the shotgun. Then Davis said, "Oh!" Then Pa got the other gun and shot it. Then John Davis fell from his horse. Then Pa walked out to the gate, then walked back to me, and said, "Ain't it awful?"

The defendant did not testify. He was convicted of voluntary manslaughter and appealed from the judgment.

*S. A. D. Eaton,* for appellant.

1. It was error to allow a private prosecutor (Campbell) to conduct and open the case for the State, where the prosecuting attorney was present. Kirby's Dig., § 2374.

2. Hurn's testimony was hearsay and prejudicial. 7 Cranch (U. S.) 290; 56 Ark. 331; *Ib.* 121; 10 *Id.* 638; 16 *Id.* 628.

3. It was error to admit the writing purporting to be the testimony of defendant before the coroner's jury. 161 S. W. 197; 2 Jones on Ev., 300; 29 S. C. 201; 31 *Id.* 403; Kirby's Dig., § 3087; 66 Ark. 53; 78 *Id.* 262; 84 *Id.* 88.

4. The court erred in refusing prayers for defendant as to "reasonable doubt and presumption of innocence" (62 Ark. 286; 12 S. W. 502; 44 S. E. 625; 37 N. E. 244); circumstantial evidence and motive for crime. (169 S. W. 437; Wills on Circ. Ev. 17; Wharton Cr. Ev. (10 ed.), 1643; Bishop, New Cr. Proc., 1076; Wills, Cir. Ev., 248; Greenl. Ev. (16 ed.), 341; 15 Sup. Ct. Rep. 394. *Hogue* v. *State,* 93 Ark. 316, is against the weight of authority.

5. A jury means twelve men whose minds must concur. 42 Atl. 228; 57 Pac. 317; 30 So. Rep. 348.

6. Appellant was a principal, not an accessory, and hence his presence was absolutely indispensable to authorize a conviction. 41 Ark. 173; 80 *Id.* 225.

7. The court gave a proper instruction as to self-defense, but refused one defining it. 85 Ark. 376; 59 *Id.* 132; 108 S. W. 669; 114 *Id.* 119.

8. There are other errors in the court's refusal of prayers for instructions. 54 Ark. 336; 55 *Id.* 588; (aiding and abetting) and in giving prayers for the State invading the province of the jury and indefinite and uncertain. 55 Ark. 588; 43 Id. 289; 45 *Id.* 165; 49 *Id.* 439; 55 *Id.* 244. The court should never assume a fact as proved. 18 S. W. 298; 46 Ind. 447; 10 Bush. 495; 39 Ill. 26; 30 Ala. 45. These errors were not cured by other instructions. It is mandatory on the court to instruct the jury on the *law* of the case, (Kirby's Dig., § 2382), to allow counsel to argue the cause (1 Bish., New Cr. Pr., 313), and direct a verdict according to law. Kirby's Dig., § 2412, etc.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. *Coon* v. *State,* 109 Ark. 359, settles the right of Campbell to prosecute and open case.

2. The conversation with James Hurn was admissible. 29 Ark. 248; 108 *Id.* 124; *Spivey* v. *State,* 114 Ark. 267; 107 Ark. 494.

3. The testimony before the coroner's jury was clearly admissible. 110 Ark. 258.

4. *Instructions.* Taken as a whole, they properly declare the law. 93 Ark. 316; 103 *Id.* 4; 34 *Id.* 721-740; 104 *Id.* 162. Objections should specifically point out errors in phraseology. 106 Ark. 369; 108 *Id.* 510; 110 *Id.* 402. See, also, 38 Ark. 304-316; 54 Ark. 621-5; 62 *Id.* 494.

5. The testimony of Jimmie Hurn is sufficient. 109 Ark. 138-149.

Kirby, J., (after stating the facts). (1) It is insisted first, for reversal, that the court erred in permitting T. W. Campbell, an attorney employed to assist in the prosecution, to make the opening statement to the jury, the prosecuting attorney being present. Section 2374, Kirby's Digest, provides that, after the jury is sworn, "The prosecuting attorney may then read to the jury the indictment and state the defendant's plea thereto and the

punishment prescribed by law for the offense, and may make a brief statement of the evidence upon which the State relies.'' Section 2388 prescribes the order of the argument. The court held in *Coon* v. *State,* 109 Ark. 346, that there is nothing in said section prescribing the order of the argument requiring the prosecuting attorney, when assisted by other counsel, to make the closing argument himself. Neither do we think the law requires that the prosecuting attorney himself shall make the opening statement to the jury; the purpose of it is to inform the jury of the issue to be tried and the testimony upon which the State intends to rely in proof thereof. This statement can be as well made by the attorney assisting in the prosecution as by the prosecuting attorney himself, and the law does not contemplate that it can not be so made, but only that such a statement shall be made by some one representing the State, in the beginning of the trial.

No error was committed in permitting this statement to be made by the attorney assisting in the prosecution.

(2) The next contention is that the court erred in the admission in evidence of the conversation between James Hurn and the deceased. The deceased immediately before riding past the wine cellar asked said witness to watch him past the wine cellar, as he supposed Tom Tiner, who was jointly indicted with appellant, had threatened his life. He then rode the 150 yards intervening, and was killed immediately opposite the wine cellar. The conversation occurred at the time and place of the killing, related thereto and was a part of the transaction, so closely connected therewith that a correct and connected account of the occurrence could not have been made without stating it. *Childs* v. *State,* 98 Ark. 435; *Carter* v. *State,* 108 Ark. 124; *Palmore* v. *State,* 29 Ark. 248.

(3) In any event, all that part of it relating to the request of deceased to see him past the wine cellar, and the witness's agreement to do so, was admissible, and if deceased's statement, that he supposed Tom Tiner had threatened his life, was objectionable, the whole of the conversation should not have been excluded on that ac-

count, and it could not have operated to the prejudice of the defendant since the father who had been convicted for the killing of the deceased, testified in this cause that he did kill him, shooting him twice, first with a shotgun, and immediately thereafter with the rifle. *Smith* v. *State,* 107 Ark. 494.

(4) The court allowed over appellant's objection the introduction of the written statement of his testimony voluntarily given before the coroner's jury, and it is strongly urged that error was committed in so doing. This is the same statement that was admitted in the former trial, and the court there held it admissible as tending to show a declaration against interest, and to establish the fact of his presence in the wine cellar, notwithstanding his contention through the testimony of his mother that he was outside and behind the wine cellar when the shots were fired. *Tiner* v. *State, supra.* The mother testified on this trial, as in the other, and likewise his father, that appellant was not in the cellar at the time of the shooting, and the appellant's voluntary statement before the coroner's jury was admissible on this trial.

It is claimed that the court made many errors in the giving and refusing of instructions, but after a careful examination of the court's charge, we are of opinion that all the correct instructions asked for by appellant that were refused by the court were fully covered by instructions given, and that on the whole they submitted the cause fairly to the jury which convicted the appellant upon virtually the same testimony that has been held sufficient to sustain a conviction by this court in two trials, that of appellant's father and of himself preceding this one.

In his motion for a new trial, he alleges the misconduct of the jury in the consideration of the case, and that several of them read the following article, which was printed in the Star Herald, a newspaper published in Pocahontas, while the trial was in progress:

"The frequency with which murderers escape the death penalty and the light sentences often given, even

when convicted at all, has caused more or less comment the country over. It has been remarked that it is probably safer to commit homicide than to be a burglar. The more serious the crime, the harder the fight is put up for the criminal. The lax enforcement of the law against homicide is one of our pet scandals, due in part to a too technical view of the law on the part of the courts and the disposition on the part of jurors to dodge a duty.

"The moment a man comes up for murder, at least in any State having capital punishment, there is a unanimous effort to dodge jury service. Thoughtful men shrink from the task. The result is, murder juries in the United States are not, as a rule, equal in intelligence or in personal force, to the panel assembled to try a man for larceny. The case that calls for the highest sense of responsibility and the hardest intelligence, may draw a minimum of these qualities.

"It is merely the duty of the murder jury to look at the evidence in a sensible, common sense, light. Even if one believes that the penalty imposed is too severe, yet the responsibility rests wholly upon the citizens of the State, and no more on the jury than on their next-door neighbors.

"In almost any murder case, an appeal to mushy sentimentalism is made. The jury is implored to disregard a sworn duty, simply because it is difficult to inflict punishment. It takes iron in the blood to stand up against these appeals to a universal sentiment. The jury that brushes aside all this fog, and renders an honest verdict on the facts, is entitled to the gratitude of the people and full recognition as to manhood."

(5) The testimony in support of this allegation consisted of one affidavit only, the affiant stating that papers containing the article were seen in the jury room while the verdict was being considered, but there was no statement that any member of the jury had read it. The article makes no direct reference to the case on trial, and does not attempt to relate any of the testimony nor comment

thereon. No such showing was made as would require the granting of a new trial because of it.

Finding no error in the whole record the judgment is affirmed.

ON REHEARING.

KIRBY, J. It is insisted on motion for rehearing that the court below erred in refusing appellant's requested instructions numbered 20 and 22, and that this court erroneously held that the same were covered by other instructions given.

Request No. 20 was sufficiently covered by instructions numbered 8 and 24, given in the court's charge. Instruction No. 22 is as follows:

"I instruct you further that in order to justify the killing of the said John R. Davis by the said Thomas L. Tiner, it is not essential that it appear to the jury that the danger was so urgent and pressing that the killing was necessary to save the life of the said Thomas L. Tiner, or to prevent his receiving great bodily harm; but should you find that the said Tiner honestly believed, without fault or carelessness on his part, that at the time the fatal shot was fired, he was in imminent danger of losing his life, or receiving great bodily injury at the hands of deceased, he should be justified and guilty of no offense.

"And if, at the time deceased was killed, he was making an attack on the said Thomas L. Tiner, and the weapon used by him, and the manner of its use, were such as were reasonably calculated to produce death or serious bodily injury, then the law presumes that the deceased intended to murder the said Thomas L. Tiner, or to inflict upon him serious bodily injury."

(6) The majority of the court is of opinion that the first part of said instruction is a correct statement of the law and was applicable to the case, and it was not covered by any of the instructions given, but the second paragraph thereof was argumentative and incorrect. Although the law presumes a person intends the necessary

and natural consequences of his acts, and when death results as such consequence the presumption is that there was an intention to kill, but there is no presumption of law of intention to murder or that such killing would be murder as stated in said instruction.

(7)    The requested instruction upon the whole being incorrect, no error was committed in the refusal to give it, and the motion for rehearing will be overruled. It is so ordered.