## LEVELLS VS. THE STATE.

1. EVIDENCE: *Admissibility, etc.*

   It is in the discretion of the court, upon the trial of a criminal cause, to permit the State to introduce additional evidence in chief, after the defendant has closed; and without some showing to the contrary, this court will presume that the discretion was properly exercised.

2. CRIMINAL LAW: *Self-defense.*

   In order to justify homicide on the ground of self-defense, the party must have employed all means within his power and consistent with his safety to avoid the danger, and avert the necessity for the killing.

3. CRIMINAL PRACTICE: *Discharge of the jury.*

   On a trial for murder the jury brought in a verdict of guilty and the court announced to the jurors that they were discharged but immediately after, and before the jurors had dispersed or mingled with the by-standers, called them back and, against the objection of the defendant, directed them to retire and amend their verdict. Held, that there was no such absolute discharge of the jury as prevented the court from recalling it for the purpose of correcting the verdict.

4. VERDICT: *General, where there is more than one count.*

   Upon an indictment for murder in which there are two counts substantially the same, a general verdict of murder in the first degree is a finding upon both counts, and is sufficient.

APPEAL from *Pulaski* Circuit Court.

Hon. J. W. MARTIN, Circuit Judge.

*Dailey,* for appellant.

*Henderson, Attorney General, contra.*

HARRISON, J.:

Jacob Levells was tried in the Pulaski Circuit Court for the murder of Robert Swan. He was found guilty of murder in the first degree. He filed a motion for a new trial; his motion was overruled, and he was sentenced to be hanged. He prayed and obtained an appeal to this court.

The indictment contained two counts, which charged the offense to have been committed by shooting, with a shot gun, and were substantially the same.

The evidence on the part of the State was, in substance, as follows:

Robert Carden testified: That the defendant lived with him on the Baldwin place in Pulaski County, and Robert Swan, the deceased, on the same place, but on the part occupied by Mr. Whitlow. That he was told on Sunday, the third day of June, 1877, about sundown, that the defendant had been cut by the deceased, and he went to his house to see him. He found him lying on a pallet in the yard, with a gash in his cheek extending from the temple to the throat, and was bleeding. The next day, Monday, he came to witness' house about 10 o'clock in the forenoon, and told him about the cutting, and the witness told him to get out a warrant for Swan. He said he did not want to go to law, and said something about fixing it up himself, and said in the conversation if he had shot Swan and had not killed him, he would have beaten him to death. He also said that he had been told that Swan threatened to kill him.

The defendant did not work Monday or Tuesday. On Tuesday afternoon, about sundown, he came through the witness' yard with a gun on his shoulder, and going in the direction of Swan's house. In about four or five minutes he heard a gun fire, two shots in succession, and a screaming by women, and he ran to the place. He found Swan down, and the defendant was

in the lane, about fifteen yards from him. He came towards Swan, excited, and said with an oath something about stamping his body. The witness told him to go away, that he had already done his work, and he said "the God damned son of a bitch was going to take my life, and now I have got him. Swan was taken to his house; he never spoke; he had one gun-shot wound in the breast ranging around from the side to the front, and another in the abdomen, from which he died a few minutes after he was taken to the house. The witness, after Swan died, saw the defendant standing in the lane and told him Swan was dead. The defendant said, "that's what I aimed to do."

Richard Smith testified that he went hunting in the afternoon of the day the deceased was killed, and upon his return he found the defendant at his house. The defendant said he would like to kill a bird or a rabbit, and asked to borrow the witness' gun, and he loaned it to him; one barrel was loaded and witness let him have powder and shot, and he loaded the other and started off. That was about an hour by sun. Swan was setting out tobacco plants just back of his house, and about fifteen or eighteen feet from the lane, and his house was about thirty steps from witness' house, across the lane. About dark the witness heard a gun fire and looked up and saw the defendant running through Swan's gate into his yard, with the gun, and saw Swan running up the fence towards the corn field. The defendant threw down the gun and picked up a hoe that Swan had thrown down and pursued him. The witness ran after them. When Swan had run about fifty yards he stopped and held up his hands and said to the defendant: "Please, Jake." The defendant struck him with the hoe, and the handle broke, and he snatched up a piece of the handle and struck him with that. Swan was shot in the left side. The gun was picked up by the witness, both barrels were empty.

Nancy Kinsloe testified : That she saw the defendant coming down the lane, about twenty-five feet from the gate, with the gun. 'Swan was about twelve feet from him setting out tobacco plants. The defendant put the gun through. the fence and shot at him.

Louis Lindsay testified substantially the same as Richard Smith.

Henry Levells testified for the defendant, that he went to see the defendant, who is his son, the evening after he was cut, and stayed there that night. That Swan came there next morning and came into the house with both hands in his pockets, and sat down with his hands in his pockets by the side of the bed on which the defendant was lying, and he said to the defendant, "I said I would kill you before the rising and setting of another sun, and I meant it when I said it;" that as he went out he said, "I believe I'll go; I'll fix you yet, Jake; I'll kill you yet, damned if I don't," and that no one else was there when Swan was there.

The State then introduced Alexander Whitlow, who testified that he had a conversation with the defendant on Monday evening in which he told him Swan was willing to compromise the matter, and asked him what he was going to do about it, and the defendant said he was not going to law about it; that Swan and himself could not live on the same place. The witness advised him to take out a warrant, but he said he did not want the law, and would attend to the matter himself.

It also introduced Amos Henderson, who testified that he went to the defendant's house Monday morning whilst Swan and Henry Levells were there, but heard no conversation. He also testified that he had a conversation with the defendant after the shooting, and in answer to a remark that he made, that Swan had told him they had compromised the difficulty, the defendant

said: "We did not. Swan came to my house Monday to compromise it, and I told him to go away, I would not."

The defendant excepted to Whitlow's testimony and a part of Henderson's because not offered until after the defendant had produced his evidence and was not in contradiction or rebuttal of it.

The testimony of Henderson does not seem liable to the objection, for it was in contradiction of that of Henry Levells.

The testimony of Whitlow would have been more properly offered before the evidence of the defendant was adduced, but its admission at the time when offered was within the sound discretion of the court, which, without some showing to the contrary, we must presume was properly and judiciously exercised.

He also excepted to the following instruction given to the jury, at the instance of the State:

"No previous assault upon the defendant by the deceased would, in itself, justify the killing of the deceased; and unless at the time of the killing, the defendant had reasonable ground to believe and did believe that such killing was necessary to protect himself from immediate danger of death or great bodily harm at the hands of the deceased; or if, notwithstanding the previous difficulty, the defendant, at the time of the killing, was actuated by motives of revenge, and not self-defense, the killing was not justifiable."

And he excepted to the refusal of the court to give certain instructions asked by him, which we do not deem necessary to set out. They were predicated upon the assumption that the evidence disclosed such facts and circumstances as indicated a necessity on the part of the defendant to kill the deceased, in order to preserve his own life, or to escape great bodily injury, or were sufficient to cause him to believe that such necessity existed.

Section 1825, of Gantt's Digest, states fully and distinctly the circumstances under which one person may take the life of another in self-defense. It is as follows: "In ordinary cases of one person killing another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily injury the killing of the other was necessary, and it must appear also, that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further contest before the mortal blow or injury was given."

It is thus seen, as we remarked in *McPherson* v. *The State*, 29 Ark., 225, that "a necessity for taking the life of the other is the controlling circumstance, which justifies or excuses the act, and, before resorting to such extremity, the party must employ all means within his power consistent with his safety to avoid the danger and avert such necessity." *Palmore* v. *The State*, 29 Ark., 248.

The deceased when shot by the defendant was making no hostile demonstrations, but was peacefully working in his tobacco patch, and the defendant, so far from being in the least danger, or having any reason to believe himself in any, appears to have sought the opportunity to kill him.

There was no error therefore in giving the instruction on behalf of the State, and in refusing to give those asked for the defendant.

The jury returned their verdict as follows:

"We, the jury, find the defendant guilty of murder in the first degree. S. Wiggins, Foreman." Which was read by the clerk, and the jury, upon request of the defendant, was polled, and each juror answered that that was his verdict. The judge then said to the jury: "Gentlemen, you are discharged; those of you who are of the regular panel, until this afternoon; those

specially summoned in this case, are discharged finally," when the jurors arose from their seats in the jury box, and began to pass out from the box, three or four at the further end of the box had moved eight or ten feet from their seats, the others still standing about where they arose, and all in full view of the judge and under his control, when he called to them, saying: "One moment, gentlemen, take your seats in the jury box again," and they, without having mingled with the by-standers, immediately returned to their seats, and the judge addressing them, said: "This verdict may be defective; there are two counts in the indictment, you will retire to the jury room and so amend your verdict as to show upon which of the counts you find."

The jury again retired and afterwards returned the verdict as follows : " We, the jury, find the defendant guilty of murder in the first degree as charged in the first count in the indictment. S. Wiggins, foreman," and they were again polled at the request of the defendant, and each answered that that was his verdict.

The defendant objected to the jury being sent back, and to any change in the verdict originally returned.

The authorities say, that after the verdict has been received and the jury discharged, their control over the verdict is at an end, and they cannot be recalled to alter or amend it. *Sargent* v. *The State of Ohio,* 11 Ohio, 472 ; *Mills* v. *Commonwealth,* 7 Leigh, 751 ; *Settle* v. *Alison,* 8 Ga., 208.

But what is a discharge ? Clearly it would seem to us that, if they have not separated, and as a body, are still in the presence of the court, the order discharging is in *fieri,* and yet in the breast of the court, and may be recalled. To correct a mistake when no prejudice can result from it, is not only proper, but the duty of the court. *Brister* v. *The State,* 26 Ala., 132.

In the case of *Rex* v. *Parker,* 2 Brit. C. Cases, 45, the prisoner was tried for stealing a bank note. The prosecutor and the pris-

oner were on the 4th of November, 1823, drinking together some hours. The prisoner's defense was that he found the note, three weeks after the 4th of November, but there was no evidence to support that defense.

The jury retired and returned, saying they found the prisoner guilty of having the note in his possession, but how he got it they could not say. The judge asked them if they thought he might have found it, three weeks after they were together on the 4th of November, and one of them said "Yes." The judge said that was an acquittal, and a verdict of not guilty was recorded.

The judge immediately gave the prisoner an admonition and ordered the note to be given to the prosecutor, when some of the jury said, that the juryman, who had answered the judge, had no authority from the others to give him the answer he did, and that several differed from him upon that answer. The jury were directed to retire again. They convicted the prisoner, but as there was an interval of three or four minutes after the verdict was recorded before the jury expressed their dissent, the point was reserved for the consideration of the judges.

And upon consideration by the judges, they were of the opinion that the mistake in the verdict might be corrected, and that the conviction was proper.

In the case before us we think there was no such absolute discharge of the jury, that the order discharging them might not be revoked, and they recalled for the purpose of correcting their verdict, but in fact no correction was necessary.

Both counts in the indictment were substantially the same and the court could judicially notice that they were for the same offense, and the verdict as originally returned was a finding on both counts, and there was no occasion for an amendment. *Brown* v. *The State,* 10 Ark., 607 ; *The United States* v. *Keen, etc.,* 1 McLean, 429 ; *Donnelly* v. *State,* 2 Dutch., 463, 601 ; *The*

*People* v. *Curling,* 1 John., 320 ; *Regina* v. *Downing,* 5 Brit. C. Cases, 53.

If the verdict had been " not guilty," there can be no question that that would have been acquittal on ·both counts, and it is equally clear that finding him guilty on the first count, as the verdict was finally returned, was finding him guilty of the offense charged in the second count.

Finding no error, the judgment is affirmed.