## SCOGGIN *v.* STATE.

### Opinion delivered July 14, 1913.

1. HOMICIDE—BURDEN OF PROOF.—In a trial for homicide, an instruction that, "The killing being proved, the burden of proving circumstances of mitigation that justify or excuse the homicide shall devolve on the accused, unless by proof on the part of the prosecution it is sufficiently manifest that the offense only amounted to manslaughter, or that the accused was justified or excused in committing homicide," is proper under Kirby's Digest, § 1765, and under this instruction the burden is on the State to show that defendant was guilty of some degree of homicide. (Page 514.)

2. HOMICIDE—LESSER DEGREE OF HOMICIDE—BURDEN OF PROOF.—In a trial for murder, where the killing is proved as alleged, and the testimony on the part of the State does not show mitigation or excuse, or show a lower grade of homicide than murder, then the accused must be convicted, unless he produces testimony to convince the jury that he is innocent, or that he is guilty of a less degree of homicide than that of murder. (Page 514.)

3. HOMICIDE—SELF-DEFENSE—RULE.—Where defendant, being tried for homicide, pleads self-defense, he must show that the circumstances surrounding him were sufficient to excite the fears of a reasonable person placed in defendant's situation. (Page 514.)

4. CRIMINAL LAW—EVIDENCE—DYING DECLARATIONS.—Where deceased told witness, "that he would not get well," the witness may properly testify as to declarations of deceased made to him at the time, the same being dying declarations. (Page 516.)

Appeal from Hempstead Circuit Court; *Jacob M. Carter, Judge;* affirmed.

#### STATEMENT BY THE COURT.

Appellant Scoggin was indicted in the Hempstead Circuit Court for the crime of murder in the first degree. He was convicted of murder in the second degree, sentenced to imprisonment in the penitentiary for a period of ten years, and has appealed to this court.

Charner Wesson, the deceased, was the father-in-law of the appellant. He was killed by the appellant in Hempstead County, Arkansas, in December, 1912. Appellant and his wife had separated the day before the killing and his wife had gone to the home of her father, Charner Wesson.

The testimony, giving it its strongest probative force on behalf of the appellant, tended to show that on the morning after appellant and his wife had separated, appellant's wife, her brother and two sisters, went back to the home of the appellant, and that appellant's wife engaged in a fight with one of his sisters, and after the fight she returned to her father's home. After reaching the home of her father, her brother, Forney Wesson, immediately went to meet his father, who was away from home.

When the deceased returned home he immediately started on horseback to appellant's home, followed by his son and two daughters in a wagon. He reached appellant's home in advance of the wagon and found that the appellant had started toward his father's house in a wagon loaded with potatoes. The deceased rode up in front of appellant's team, stopped them and immediately got down, turned his mule loose, pulled off his gloves, threw them down and began to curse and abuse the defendant. Leaving the front of the mules, he walked down by their side, using violent and insulting language toward the appellant and cursing him, remarking that he came after the potatoes and if he didn't get them he would get something else. He caught the lines and stopped the team, threw his hand to his hip pocket as if to draw a weapon, whereupon the defendant shot him.

The deceased, at the time he was shot, was about opposite the back part of the fore wheels and the defendant was about the middle of the wagon. The shooting took place within the enclosure of the defendant.

The defendant testified, in part, that deceased "never did tell me that he was going to kill me, but he

was going to have them potatoes or something else, and when I told him I would let the law settle it, he said, 'Law, nothing; you little G—d d— s— of a b—, we will see about it now.' He didn't tell me that he was going to shoot me, but he said he was going to see about it now. He put his left hand to his hip pocket, and I had the gun on my foot and I picked the gun up and cocked it as I was bringing it up. He had thrown his hand to his hip pocket when I shot." He further testified: "I was afraid of him, and when he started toward me I had the gun standing on my foot in one hand, and I shot him because he made an attempt; I thought he was going to do something to me; I thought he meant to kill me and that is why I shot."

On behalf of the State, the proof tended to show that deceased went to the defendant's home for the purpose of getting some potatoes and chickens for his daughter; that he went to defendant to ask whether or not he wanted his wife, deceased's daughter, to have part of the potatoes, and said that if defendant didn't want her to have them he would just leave them alone and go back. Deceased went horseback, and at the time he was shot he was near defendant's house. Deceased had dismounted, and was about ten feet from defendant's wagon and seemed to be talking to him and had said a few words before the shot was fired. He had not turned his horse loose, but was holding the rein with his left hand and was not doing anything with his right hand. About the time the defendant shot, the deceased threw up both hands. The shot entered his right hand, tearing same almost off. There were also a few shot in the left hand, about the wrist and thumb. There were also some in his face, over his right eye, in the eye and up to his hair; part of it went over the right eye, and in the eye, and up to the hair. The principal part of the load entered just over his right eye and in his eye. The nature of the wounds indicated that the deceased was standing in front of the defendant, facing him.

The court permitted witness Turner Rogers to testify, over defendant's objections, to a conversation he

had with the deceased on Sunday after the shooting. Witness stated that he left his home between daylight and sunup, and that he lived about a quarter of a mile from deceased; that no one was present but witness and the deceased when the deceased told him about how the shooting occurred. The deceased told him that he would not get well, and told witness that he "went up there to see Ezra to straighten up this little difference between him and his wife." He said he "went there to talk about this little trouble between him and his wife. Said he got over there and spoke to him, and that he told him he came over there to talk with him, and that he says Ezra sorter reached down this way and picked up his gun and threw it over on him and fired and he threw up his hands."

The court refused, over appellant's objection, to permit testimony tending to show the feeling existing between deceased and defendant's people prior to the killing and testimony about the fight between defendant's wife and his sister on the morning of the shooting, and also refused to allow testimony that the deceased had a pistol prior to the killing. Appellant duly excepted.

The court, among others, gave the following instruction: "The killing being proved, the burden of proving circumstances of mitigation that justify or excuse the homicide shall devolve on the accused, unless by proof on the part of the prosecution it is sufficiently manifest that the offense only amounted to manslaughter or that the accused was justified or excused in committing homicide."

Other facts stated in the opinion.

*Sain & Sain,* for appellant.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

WOOD, J., (after stating the facts). There was no error in the granting of prayer for instruction No. 11 at the instance of the State. This instruction is a copy of the statute. Section 1765, Kirby's Digest. It does not

shift the burden of proof from the State to the defendant in a trial for homicide. On the contrary, under it the burden of the whole case is on the State to show that the defendant is guilty of some degree of homicide. When the State has done this, then if there is nothing in the testimony adduced by the State to show that the accused is justified or excused, it devolves upon him to make such proof before he would be entitled to an acquittal. Where the testimony on behalf of the State tends to show the killing, and that it was done as charged in the indictment, if there is nothing in the evidence adduced by the State tending to show that the defendant is guilty of manslaughter, then it devolves upon the defendant to bring forward such testimony if he would have the grade of homicide reduced from murder to manslaughter. In other words, where the killing is proved as alleged, and the testimony on the part of the State does not show mitigation or excuse, or show a lower grade of homicide than murder, then the accused must be convicted unless he produces testimony to convince the jury that he is innocent, or that he is guilty of a less degree of homicide than that of murder. *Petty* v. *State,* 76 Ark. 515. The statute does not shift the burden of proving guilt from the State to the defendant.

In many of the other instructions the court required that the jury should be convinced of appellant's guilt "beyond a reasonable doubt" before they were authorized to convict appellant, and gave a correct instruction defining a reasonable doubt. So that the jury could not have understood that the burden of proof was on the appellant to establish his innocence. They were clearly told that it was the duty of the State to prove his guilt. See *Thomas* v. *State,* 85 Ark. 357; *Cogburn* v. *State,* 76 Ark. 110.

The court, at the request of the State, granted prayers telling the jury, in effect, that before the appellant could be justified in killing Wesson, it must have appeared to him, that the killing was necessary in order to save his own life or to prevent his receiving great

bodily harm, and that he must have acted in good faith, having reasonable cause for his belief, and that if it so appeared to him, acting in good faith, and he had reasonable cause therefor, he would be excused, though he might have been mistaken as to the apparent danger. In other words, that the circumstances surrounding the appellant must have been sufficient to excite the fears of a reasonable person placed in appellant's situation.

The court, at the instance of the appellant, gave instructions to the effect that if the appellant believed that it was the intention of the deceased to kill appellant, or to do him some great bodily harm, and that appellant, without fault or carelessness on his part, shot the deceased, he was justified in so doing; that it was sufficient if the appellant, acting without fault or carelessness on his part, honestly believed that the killing was necessary, if he acted under such circumstances as made it reasonable to entertain that belief.

In *Hoard* v *State,* 80 Ark. 87, this court held: That "it was not error to instruct the jury that one who killed another was justified in defending himself if it appeared to him, 'acting as a reasonable person,' without fault on his part, that he was in danger of losing his life or receiving great bodily harm, as the law presumes, where nothing to the contrary is shown, that the accused is of ordinary reason and holds him accountable accordingly."

The instructions given at the request of the appellant followed the language of the rule approved by this court in *Smith* v. *State,* 59 Ark. 137, and *Magness* v. *State,* 67 Ark. 594.

The instructions given at the instance of the State followed the rule approved by this court in other cases. *Palmore* v. *State,* 29 Ark. 248; *Levells* v. *State,* 32 Ark. 585; *Fitzpatrick* v. *State,* 37 Ark. 257.

Speaking for the court in *Hoard* v. *State, supra,* Mr. Justice RIDDICK said: "For ordinary cases, we think there is no substantial difference in these two ways of stating the rule, and consider it a matter of form that

should be left to the taste and judgment of the trial judge."

Other instructions were given and refused, to which exceptions were duly saved, and which we have carefully examined, but find no prejudicial error in the rulings of the court.

Appellant contends that the court erred in permitting the witness, Turner Rogers, to testify concerning the declarations of the deceased to him on Sunday morning after the shooting; but the testimony was competent as showing dying declarations. Rogers testified that the deceased told him "that he would not get well."

Appellant contends that the court erred in not permitting him to show that the doctors had informed the deceased after the shooting that he would get well, but the appellant did not offer to show that the doctors imparted such information to the deceased before he made the statements shown by the testimony of the witness, Rogers. There was nothing, therefore, in this offered testimony tending to rebut the testimony of the witness, Rogers, showing that the declarations of Wesson, the deceased, were made while he was *in extremis*.

The testimony was sufficient to sustain the verdict. The charge of the court correctly submitted the issues that were raised by the evidence. There was no error in the rulings of the court in the admission or rejection of testimony.

We have considered the assignments of error presented in appellant's motion for a new trial, and find that there is no prejudicial error in the rulings of the court in any of them. The judgment is therefore correct, and must be affirmed.