**PENDERGRASS et al. v. NEW YORK LIFE INS. CO. et al.**

No. 14048.

United States Court of Appeals
Eighth Circuit.

April 3, 1950.

Clinton R. Barry and John E. Harris, Fort Smith, Ark., for appellants.

Robert L. Jones, Jr., Fort Smith, Ark. (G. C. Hardin, J. Clib Barton and Bruce H. Shaw, Fort Smith, Ark., were with him on the brief), for appellee Ann Pendergrass and Ann Pendergrass, Executrix of the estate of Willard Pendergrass, deceased.

Before SANBORN, WOODROUGH, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

This is a controversy between the appellants and the appellee Ann Pendergrass over the proceeds of a $6,000 policy of insurance upon the life of Willard Pendergrass. The insured was the father of the appellants by a divorced wife, and the husband of Ann Pendergrass, by whom he was shot and killed November 6, 1948. She was the designated beneficiary in the policy at the time of his death.

The appellants brought an action in the District Court against the New York Life Insurance Company, the insurer, upon the claim that the beneficiary had feloniously and unlawfully killed the insured, thereby disqualifying herself from receiving the proceeds of the policy, and that they (the appellants), as the insured's sole surviving heirs, were entitled to the benefits of the policy.

The insurer converted the action into one in interpleader, and, by order of the court, Ann Pendergrass, as an individual and as executrix of the insured's estate, was made a cross-defendant. In her answer she denied that she had unlawfully killed the insured or disqualified herself as beneficiary, and asserted that she was entitled to the proceeds of the policy.

The sole issue, under the pleadings, was whether the killing of the insured (for which his wife was not prosecuted) was justifiable homicide under Arkansas law. That issue was tried to the court, which found that Ann Pendergrass had justifiably killed the insured in self-defense, and had not disqualified herself from receiving the proceeds of the policy. A judgment was entered in her favor, from which this appeal has been taken.

The appellants contend, in effect, that, under the evidence and the law of Arkansas, they were entitled to judgment. In their brief they say:

"This case was tried to the court, without a jury upon equitable principles and is here, upon appeal, for trial de novo.

"It is, therefore, both proper and legal for this Honorable Court to try this case upon the testimony taken in the lower court, and decide it as though it had not heretofore been decided."

The appellants have misconceived the functions of this Court, the jurisdiction of which is appellate. In the case of Cleo Syrup Corporation v. Coca-Cola Co., 8 Cir., 139 F.2d 416, 417–418, 150 A.L.R. 1056, we said: " * * * This Court, upon review, will not retry issues of fact or substitute its judgment with respect to such issues for that of the trial court. Storley v. Armour & Co., 8 Cir., 107 F.2d 499, 513; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199; Travelers Mutual Casualty Co. v. Rector, 8 Cir., 138 F.2d 396, 398. The power of a trial court to decide doubtful issues of fact is not limited to deciding them correctly. Thompson v. Terminal Shares, Inc., 8 Cir., 89 F.2d 652, 655; Pittsburgh Plate Glass Co. v. National Labor Relations Board, 8 Cir., 113 F.2d 698, 701 (affirmed 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251); Travelers Mutual Casualty Co. v. Rector, supra. In a nonjury case, this Court may not set aside a finding of fact of a trial court unless there is no substantial evidence to sustain it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law. Ætna Life Ins. Co. v. Kepler, 8 Cir., 116 F.2d 1, 4, 5; Gasifier Mfg. Co. v. General Motors Corporation, 8 Cir., 138 F.2d 197, 199;

Travelers Mutual Casualty Co. v. Rector, supra."

■ It is true that in United States v. United States Gypsum Co., 333 U.S. 364, at page 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, the Supreme Court said: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." The opinion in that case shows that the Supreme Court regarded the findings which it held to be erroneous as contrary to the clear weight of the evidence. The statement above quoted, when read in connection with what was later said by the Supreme Court on the same subject in Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 336 U.S. 271, 275–276, 69 S.Ct. 535, furnishes no warrant for the belief that we can retry doubtful issues of fact upon a cold record, and substitute our judgment for that of the trial court with respect to such issues, or that a district court, in nonjury cases, is to act as a sort of special master for this Court, to report testimony, to make advisory findings, and to enter an advisory judgment.

■ There is no logical reason for placing the findings of fact of a trial judge upon a substantially lower level of conclusiveness than the fact findings of a jury of laymen, or those of an administrative agency, which may be set aside only if unsupported by substantial evidence. The findings of fact of a trial court should be accepted by this Court as being correct unless it can be clearly demonstrated that they are without adequate evidentiary support or were induced by an erroneous view of the law. The entire responsibility for deciding doubtful fact questions in a nonjury case should be, and we think it is, that of the district court. The existence of any doubt as to whether the trial court or this Court is the ultimate trier of fact issues in nonjury cases is, we think, detrimental to the orderly administration of justice, impairs the confidence of litigants and the public in the decisions of the district courts, and multiplies the number of appeals in such cases.

■ The sufficiency of the evidence to support a trial court's findings and judgment is, of course, a proper question on review. Whether a reviewing court thinks that it would or might have made different findings of fact or have entered a different judgment, had it been the trier of the facts, is a matter of no consequence. On review, this Court should refrain from exercising any of the trial functions conferred by law upon the district courts.

■ We shall not attempt to set forth in this opinion a detailed statement of the evidence. Much of it deals with the character of the insured, his way of life, and the treatment accorded by him to his wife from the time of their marriage until his death. In considering the question of the sufficiency of the evidence, we are required to give to Ann Pendergrass, as the prevailing party, the benefit of all reasonable inferences which can be drawn from the evidence, viewed in the light most favorable to her.

The record shows that the insured and Ann Pendergrass were married in 1940. He was then, apparently, about sixty-three years of age and she was about forty. Each had been married before and each had two children by a former marriage. The children did not live with them. The insured was an attorney, who lived and had an office in Paris, Arkansas. He had no means. She had inherited properties of considerable value from a deceased husband. After the marriage, the insured dominated his wife, and had her place all of the properties she owned in their names as joint tenants by the entirety. As her properties were sold, the proceeds were deposited in a joint bank account and were used for living expenses and the construction of a home upon a 600-acre farm on top of Doug Mountain, about two and one-half miles south of Paris, Arkansas. The farm had been purchased by the insured and his wife as tenants by the entirety. They lived there after August 15, 1946.

The insured prevented his wife from visiting her children or having them visit her, and denied her the privilege of attending church or of seeing friends. He was addicted to the excessive use of intoxicat-

ing liquor and when under its influence was profane and abusive. He had killed two men, and in the community where he lived had the reputation of being a violent and dangerous person. He sometimes boasted of having shot seven men, four of whom recovered. He not infrequently threatened to take his wife with him when he thought he might die. She was afraid of him. He would, on occasion, threaten to kill his own children. He kept two pistols within reach most of the time, one at the office in his desk, and another that he carried around with him in his car and brought into the house.

What occurred on the day of the shooting is stated with substantial accuracy in the following findings of the District Court: "On the afternoon of November 6, 1948, the deceased was drunk, he having been under the influence of alcohol for several days. The cross-defendant left him at their home and proceeded into the Town of Paris to the deceased's law office which she assisted him in maintaining. During the afternoon the deceased woke up and staggered down the mountain toward Paris. Some neighbors heard him hollering and yelling for help, and at his request took him to the Paris Hospital. The cross-defendant received information that her husband was in the hospital and proceeded there and at his request took him to their home. This occurred about 5:00 o'clock in the afternoon. The cross-defendant left the deceased asleep in their car while she went about doing the chores on the farm. Several hours later he awakened and the cross-defendant assisted him in the house to his bedroom. At this time the deceased was violent and abusive to the cross-defendant. When in the bedroom the deceased struggled with the cross-defendant and attempted to choke her. She extricated herself from his hold and flung her body across his in an attempt to hold him on the bed. The deceased threw the cross-defendant to the floor. At that time she had an urge to run but the deceased, with an oath, then demanded his gun. The cross-defendant impulsively began to execute his command as she had done many times before. Just as the cross-defendant was handing the gun to the deceased, the latter, with an oath, threatened to 'kill' or 'get' the cross-defendant. He made this threat as he was arising from the bed, and at that moment the cross-defendant pulled the trigger. After firing the shot the cross-defendant fled from the house in a hysterical state, realizing that she had hit the deceased but not knowing that she had killed him. She drove to town, and after a futile attempt to locate an officer on the streets, she went to the office of the deceased and telephoned her doctor and the law enforcement officers, advising them of what had occurred. The doctor and officers proceeded to the house and found that the deceased was dead."

The court also found as a fact that: "The circumstances surrounding the shooting were such as to convince a reasonable person, in the exercise of due caution and prudence, that he was in danger of losing his life or of receiving great bodily harm at the hands of the deceased, and the cross-defendant, in firing the fatal shot, acted without carelessnesss on her part and with the honest belief that she was in danger of losing her life or of receiving great bodily harm. She acted without malice, express or implied, and did not fire the shot in a spirit of revenge."

The court concluded that: "The cross-defendant, Ann Pendergrass, acted in necessary self-defense in killing the deceased. This constitutes justifiable homicide as defined in Arkansas Statutes (1947), Section 41-2231, and the decisions of the Arkansas Supreme Court thereunder."

The pertinent sections of the Arkansas Statutes, 1947, Annotated, read as follows:

"41-2231. *Justifiable homicide defined.*— Justifiable homicide is the killing of a human being in necessary self-defense, or in the defense of habitation, person or property, against one who manifestly intends or endeavors by violence or surprise, to commit a known felony.

"41-2232. *Attempts justifying homicide.* —An attempt to commit murder, rape, robbery, burglary, or any other aggravated felony, although not herein specially named, upon either the person or property of any person, shall be justification of homicide."

"41-2235. *Bare fear no justification.*— A bare fear of those offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing; it must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under their influence, and not in a spirit of revenge.

"41-2236. *Killing in self-defense.*—In ordinary cases of one person killing another in self-defense, it must appear that the danger was so urgent and pressing, that in order to save his own life, or to prevent his receiving great bodily injury, the killing of the other was necessary and it must appear also that the person killed was the assailant, or, that the slayer had really and in good faith, endeavored to decline any further contest, before the mortal blow or injury was given."

The decisions of the Supreme Court of Arkansas construing these statutes do not demonstrate that the findings of the District Court were induced by a misconception of the Arkansas law. In Palmore v. State, 29 Ark. 248, at page 266, the Supreme Court of Arkansas said: "* * * To excuse homicide, it must appear that the danger is not only impending, but so pressing and urgent as to render the killing necessary (Gantt's Dig., sec. 1285; McPherson v. State, ante, [29 Ark.] 225); and the circumstances must show that there was sufficient to arouse the fears of a reasonable person, and that the party killing really acted under their influence, and not in a spirit of revenge. Gantt's Dig., sec. 1284."

In Scoggin v. State, 109 Ark. 510, 159 S.W. 211, 213, that court said: "The court [trial court], at the request of the state, granted prayers telling the jury, in effect, that before the appellant could be justified in killing Wesson, it must have appeared to him that the killing was necessary in order to save his own life, or to prevent his receiving great bodily harm, and that he must have acted in good faith, having reasonable cause for his belief, and that if it so appeared to him, acting, in good faith, and he had reasonable cause therefor, he would be excused, though he might have been mistaken as to the apparent danger. In other words, that the circumstances surrounding the appellant must have been sufficient to excite the fears of a reasonable person placed in appellant's situation. The court, at the instance of the appellant, gave instructions to the effect that if the appellant believed that it was the intention of the deceased to kill appellant, or to do him some great bodily harm, and that appellant, without fault or carelessness on his part, shot the deceased, he was justified in so doing; that it was sufficient if the appellant, acting without fault or carelessness on his part, honestly believed that the killing was necessary, if he acted under such circumstances as made it reasonable to entertain that belief. In Hoard v. State, 80 Ark. 87, 95 S.W. 1002, this court held that 'it was not error to instruct the jury that one who killed another was justified in defending himself, if it appeared to him, "acting as a reasonable person," without fault on his part, that he was in danger of losing his life or receiving great bodily harm, as the law presumes, where nothing to the contrary is shown, that the accused is of ordinary reason, and holds him accountable accordingly.' The instructions given at the request of the appellant followed the language of the rule approved by this court in Smith v. State, 59 Ark. 132, 137, 26 S.W. 712, 43 Am.St.Rep. 20, and Magness v. State, 67 Ark. 594, 50 S.W. 554, 59 S.W. 529. The instructions given at the instance of the state followed the rule approved by this court in other cases. Palmore v. State, 29 Ark. 248; Levells v. State, 32 Ark. 585; Fitzpatrick v. State, 37 Ark. 238, 257. Speaking for the court in Hoard v. State, supra, Mr. Justice Riddick said: 'For ordinary cases we think there is no substantial difference in these two ways of stating the rule, and consider it a matter of form that should be left to the taste and judgment of the trial judge.' "

While the factual picture drawn by the appellants from the evidence is that of an elderly, sick, intoxicated and helpless man, deliberately and unjustifiably shot while in bed, we think that, under the evidence, the questions whether or not Ann Pendergrass shot the insured in self-defense

and whether the shooting constituted justifiable homicide under Arkansas law were questions of fact for the District Court to determine. Compare, Mutual Ben. Health & Accident Ass'n v. Tilley, 176 Ark. 525, 3 S.W.2d 320, 321. It must also be remembered that this Court will accept the considered views of a District Judge as to doubtful questions of local law. See Northern Liquid Gas Co. v. Hildreth, 8 Cir., 1950, 180 F.2d 330, and cases cited.

The judgment appealed from is affirmed.