**Martha LYONS, Appellant,**

v.

**BOARD OF EDUCATION OF CHARLESTON REORGANIZED SCHOOL DISTRICT NO. 1 OF MISSISSIPPI COUNTY, MISSOURI, et al., Appellees.**

**No. 75–1025.**

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1975.

Decided Sept. 3, 1975.

Before GIBSON, Chief Judge, STEPHENSON, Circuit Judge, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

The case before us is an appeal by the plaintiff from a dismissal of her civil rights action, brought under 42 U.S.C. § 1983, against the Board of Education of Charleston Reorganized School District No. 1 of Mississippi County, Missouri, the former Superintendent of Schools, the President of the Board of Education, and individual members of the Board, seeking both injunctive and monetary relief.

The plaintiff was employed as a non-tenured elementary school teacher by the District for the 1971–1972 school year. Her bill of complaint alleges that in April of 1972 she was notified that her teaching contract would not be renewed, and, that should later vacancies occur, "teachers so released will be considered first." In August, when such vacancies did occur, none of the available positions was offered to her. These actions, she complained, were racially motivated, she being a black teacher.

Extensive discovery was had. The record before us consists of interrogatories by both sides, depositions of the principal parties, and affidavits by members of the School Board. Thereafter, and on May 16, 1974, defendants filed a motion for summary judgment, offering portions of the record in support thereof. When the motion came on for hearing on May 29, 1974 judgment for defendants was entered, after consideration of the record and oral argument. We affirm.

The record discloses that the plaintiff graduated in June of 1968 from Mississippi Valley State College, having majored in business administration. She was first employed by the Charleston Board for the 1968–1969 school year, and thereafter re-employed, successively in

James I. Meyerson, New York City, for appellant.

John L. Oliver, Jr., Cape Girardeau, Mo., for appellees.

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

April of each year,[1] as a probationary teacher through the 1971–1972 school year. At the regular meeting of the Board of Education on April 11, 1972 the Board voted not to re-employ 16 elementary teachers, of whom plaintiff was one. Of these 16 teachers 12 were white and four, including plaintiff, were black.

The reason for the reduction in staff was financial. The Board had neither commitment nor verbal assurance that it would receive further educational funds from the Department of Health, Education, and Welfare. Moreover, a shortage in state funds had been experienced in the preceding year.[2] Faced with what the Board felt was a financial crisis, requiring the elimination of 16 of the teaching staff, the records of all teachers were examined on a comparative basis, considering their "professional skills, qualifications and relationship to the elementary program of the district." The tenured teachers were first placed "in the slots for which they were qualified,"

then the "special skills" teachers (such as speech therapy, physical education, and remedial reading) were placed. The remaining teachers were then compared. It was the policy of the Board to reduce the number of teachers who, as a result of prior school consolidations and teacher shortages, had been employed, but who did not possess the college credits required by the State for permanent licensing. The plaintiff was among this group. Her classroom performance was rated as good to adequate, except where it related to team teaching.[3] She suffered, however, it was considered, from two major failures:

[H]er relationships and dealings with her professional teaching and administrative colleagues and her apparent refusal or failure to obtain the requisite academic credits necessary to obtain a permanent or life certificate from the Missouri State Department of Education[4] and the hesitant cooperation plaintiff gave the Board in dealing

---

1. V.A.M.S. § 168.126(3) (Supp.1969). *See also* V.A.M.S. § 168.106(5) (Supp. 1969).

2. "A good deal of discussion was had as to whether or not we would even have a Title I program for the 1972–1973 school year. Nonetheless, after discussion, we had prepared and submitted the formal program. But as of April 11th we had not received any verbal okay. In this regard when we began preparation of the budget without any verbal approval *and in view of the 1971–1972 year* experience and also in view of the fact that our state funds had been $20,000.00 short for the preceding year, it was my recommendation to the board and the board's decision and my decision not to chance Title I funds for the next year. We did not have the balance to pay the Title I teachers on hand and my calculations indicated that we would not have funds available, absent Title I.

It was therefore determined that we would not *employ teachers nor administrators to* handle a Title I program for the 1972–1973 school year. Members of the board and myself checked with the Missouri State Department of Education and they concurred in this decision. As we had already employed in the current school year teachers for Title I program, a reduction in staff became necessary. Following board directions we calculated taking into account tenured teachers,

available *funds and based on what we knew* about who would not be back determined that we would need sixteen less teachers in the 1972–1973 school year in the elementary education program which we would have. In other words, our budget required a reduction in staff of sixteen (16) teachers." Affidavit of Thomas Wells, former Superintendent of Schools, Charleston Reorganized School District No. 1.

3. This refers to teaching a class jointly by two or three teachers, sharing responsibilities and thereafter exchanging critiques.

4. With respect to plaintiff's obtaining a permanent teaching certificate, as distinguished from her temporary or interim certificate, Mr. Wells, formerly Superintendent of Schools, testified on deposition: "We did have her set up in one year to take her practice teaching to secure a permanent Certificate, and during the first nine weeks of school, of the school term, *we were going to hire a substitute for her to* fill in for her while she was taking her practice teaching, so that she could secure her permanent Certificate. But she didn't follow up on that contract for some reason. She just didn't continue on her contract." The practice teaching period was a requirement of the State in completing work for a life certificate. (Footnote ours.)

with the problems created by her academic deficiencies. These difficulties manifested themselves in a variety of ways such as disregarding Board policy in the imposition of corporal punishment[5] and then her attitude of disrespect and disregard when administrative personnel attempted to discuss it; in her refusal to sign her last written "Service Report" acknowledging receipt and discussion of the same; in her antagnostic [sic] attitude toward her colleagues, which was disruptive of harmony among teachers and which seemed to reach a point where she expected to be treated as in some way superior to her colleagues; in her refusal to comply with a simple request in accordance with Board policy that her doctor furnish written verification of the delivery date; in her apparent refusal to do her practice teaching when scheduled and though required under her academic contract with Southeast Missouri State University. These attitudes and their manifestation appeared in other incidents and in such areas as relationships with parents and participation in school sponsored activities.

The Board's complaints, then, are both subjective and objective. We now turn to the specifics of plaintiff's assertion of discrimination, which were made in her complaint upon what she had been "informed and verily believes." When asked to state why, in her judgment, a contract was not tendered her for the 1972-1973 school year, she replied:

A. Sir, I do not know. I would like to know, that is the reason I retained a lawyer so I could find out.

Q. * * * Other than the defendants you have named in this lawsuit, Mrs. Lyons, do you know or believe there are other people who might know.

A. Know what?

Q. The basis why you were not tendered a contract for the 1972-1973 school year.

A. Definitely, I would not know. All I do know is that I was not—and that is just about it, I don't know who else would know.[6]

Questioned as to the reason for her belief that she was not considered for re-employment, she replied:

A. Well, I do not have any information, but I do feel that it was not because I was never told that your application is on file or that if any vacancies occur which I know there were vacancies, there were because there were teachers resigning all along, *but as far as any factual information, no I don't have any.* (Emphasis added.)

Likewise, when asked to state the factual bases for her claims of discrimination she replied:

Well, I am basing it strictly on the atmosphere of the community in which the school district is located and the people that are within the school system, that is the only thing.[7]

---

5. This refers to plaintiff's administration of corporal punishment to a white student in the absence of an administrator (Principal or Assistant Principal). The presence of an administrator is required by written Board policy should any child receive corporal punishment. (Footnote ours.)

6. On August 10 plaintiff met with the Board at her request, to find out the "real reason" why she was not rehired and to inquire about future prospects. The meeting was apparently nonproductive. (Footnote ours.)

7. In Interrogatory # 20 she was asked the basis for her apparent belief that the Board was required to offer her continued employment for the school year 1972-1973 and for the school year 1973-1974. Her answer, in its entirety, is as follows:

20. (a) I was on maternity leave and entitled upon termination of that leave to priority of consideration

(b) BOE [Board of Education] is a public body supported by tax money and should have criteria and use objective and nondiscriminatory standards for the evaluation and retention of teachers

(c) Based on competence, fitness and experience my qualifications merited renewal of my contract

We have searched with care through the record, seeking specifics as to her complaints but find none. We find testimony of conflicts within the system, between plaintiff and her school superiors (e. g., the punishment incident, supra ), but they go to school discipline and administration rather than to race. We are not blinded, of course, by claims of purity of motive if belied by actions contrary thereto, but it is just at this point that plaintiff's case fails. The manifestations of discrimination asserted in conclusionary terms or upon information and belief in the complaint are not sustained by the record. Thus plaintiff in her brief argues that "disparate numbers of Black teachers were separated from the system from 1963 on once the system began to ostensibly desegregate; and at the same time disparate numbers of white teachers were assigned to the school where the Appellant taught, a very heavily white school compared to the elementary schools in the District, and an even whiter, faculty-wise, with the separation of the Appellant from her position."

In disregard of the Federal Rules of Appellate Procedure,[8] no references to the Appendix or Record are cited in support of these statements, but the answer to Plaintiff's Interrogatory No. 4 casts some light thereon. In this interrogatory plaintiff requested that:

4. For each of the last ten (10) years [defendants] indicate the number of teachers and administrative personnel who were terminated from the R–1 District Public School System; indicate the race of the individual terminated, the position said person held at the time he or she was terminated, the number of years said person had been employed by the R–1 District Public School System and the reason said person was terminated.

Our recapitulation of some eight pages of the answer indicates that in 1963–1964, 13 black and 34 white teachers and administrators were terminated; in 1964–1965, 6 black and 15 white; in 1965–1966, 12 black and 24 white; in 1966–1967, 7 black, 20 white; in 1967–1968, 5 black and 15 white, and in 1968–1969, 6 black and 32 white. Coming to more recent years, in 1969–1970, 7 black, 23 white; in 1970–1971, 11 black, 13 white; in 1971–1972, 10 black, 43 white. Most of the terminations were due to resignations. Thus in 1968–1969, when 6 black and 32 white teachers and administrators were terminated, all had resigned, both black and white. We cannot conclude, as plaintiff asserts, that disparate numbers of black teachers have been terminated, nor that the ratio of white to black teachers had consequently increased.[9]

(d) Members of the Board have a duty and obligation not to be influenced in their selection of teachers by inflamatory [sic] or petty reasons with racial overtones and certainly not by any standard that reflects the ancient badge of slavery that blacks are not to be forthright, outspoken or function as equals with all other citizens. In my judgment it is my insistence on functioning as an equal in a free society that may be the cause of my difficulty with the defendants

(e) BOE desperately needs experienced competent teachers and there is a disturbing pattern in the hiring practices of BOE which reflects a policy of hiring that suggests experience and competence are being sacrificed for the economy achieved in using teachers with less or no experience

8. See Fed.R.App.P. 28(a)(4).

9. The matter of ratio was explored by the trial court upon oral argument:

THE COURT [to plaintiff's counsel]: * * Can you advise the Court, either you or Mr. Oliver, as to whether there was a marked change in the ratio [of black to white teachers] one way or the other after the action on April 12th * * *?

* * * * * *

MS. WILSON: Well, I cannot give it to you accurately, Your Honor, and maybe Mr. Oliver can or Mr. Tindall, who are presumably more familiar with this, but I have the entire list of the panel of people who were hired between August and October of that year and I counted them some time, but I don't have the count. But the substantial part of them are White.

THE COURT: Did it make any marked change in ratio? That's my question. I as-

■ Plaintiff's brief also argues that "the gravaman [sic] of Appellees' specific defense * * * is that the Appellant did not have a regular state teaching certificate and that such was her major failure and the reason for the non-renewal of her contract." In this, plaintiff is correct. With respect to it we have held heretofore that the requirement of appropriate certification is a valid nondiscriminatory reason for the nonretention of a teacher.[10] But, as with all other requirements as to employment and discharge, it must be applied in a nondiscriminatory manner. Plaintiff argues that here it was not so applied, arguing that "before and after the Appellant was not re-employed in 1972, the School Board employed non-certificated teachers." Again there is no Appendix reference for this statement and our reading of the entire record convinces us that it does not state the fact. What the plaintiff may have reference to is that after 1972 one non-life certificate holder (that is, one teacher with only an interim certificate, as plaintiff's) was employed, but he was a teacher who had completed his student teaching, with a master's degree, eleven years of teaching experience, and lacking his lifetime certificate only because he had not been a resident of Missouri long enough to qualify for his residence requirement.

■ In our consideration of the issue presented[11] we start with the proposition that the Board of Education, not a court of law, exercises control over the School Districts, employing their discretion in the premises.

> School boards are vested with wide discretion in matters affecting school management, including the employment of teachers, and a court may not interfere with the board's action unless the board has exercised its power in an unreasonable, arbitrary, capricious, or unlawful manner. [Citations omitted.]

*Brooks v. School District of Moberly, Missouri,* 267 F.2d 733, 739 (8th Cir.), *cert. denied,* 361 U.S. 894, 80 S.Ct. 196, 4 L.Ed.2d 151 (1959). *See also Adamick v. Ferguson-Florissant School District,* 483 S.W.2d 629 (Mo.Ct.App.1972). *But cf. Wilson v. Pleasant Hill School District R–III,* 334 F.Supp. 1197, 1199 n. 3 (W.D. Mo.1971), *aff'd,* 465 F.2d 1366 (8th Cir. 1972).

It is equally clear, however, that:

> [R]ace per se is an impermissible criterion for judging either an applicant's qualifications or the district's needs. And this applies equally to considerations described as environment or ability to communicate or speech patterns or capacity to establish rapport with pupils when these descriptions amount only to euphemistic references to actual or assumed racial distinctions.

*Smith v. Board of Education of Morrilton School District No. 32,* 365 F.2d 770, 782 (8th Cir. 1966).

Plaintiff places her principal reliance upon *Moore v. Board of Education of*

---

sume from this sixteen figure, twelve and four—now, I assume—well, a substantial part of those were White.
    MS. WILSON: Right.
    THE COURT: 75%, to be exact.
    MS. WILSON: Right, but there were only sixteen. They hired almost fifty.
    MR. OLIVER: Your Honor, you want the exact figures?
    THE COURT: That's what I'd like to have.
    MR. OLIVER: I haven't figured out the ratio. Judge, obviously the ratio increased, more Blacks per White on the twelve, the day after. There were 29% on the 14th, 31% on the 12th, and somewhere between 29 and 30% at the start of the school year.

There was a total of one less Black teacher for '72–73 than there had been for '71–72.
    Now Your Honor, let me qualify that. I'm talking strictly about elementary education.

**10.** *Jackson v. Wheatley School District No. 28 of St. Francis County, Arkansas,* 430 F.2d 1359, 1364 (8th Cir. 1970).

**11.** *See generally* Lieberman, *Teachers And The Fourteenth Amendment—The Role of Faculty In The Desegregation Process,* 46 N.Car.L.Rev. 313 (1968); *Discrimination in the Hiring and Assignment of Teachers in Public School Systems,* 64 Mich.L.Rev. 692 (1966).

*Chidester School District No. 59, Chidester, Arkansas,* 448 F.2d 709 (8th Cir. 1971) wherein we held:

> While the burden of proving discrimination would under some circumstances rest with the dismissed teachers, under other circumstances, we have held it shifts to the school district. A school district must show by "clear and convincing" proof that the dismissal of black teachers was not unlawfully discriminatory if the district has a long history of segregation, if there is a decrease in the number of black teachers, if the proportion of the black faculty to white faculty is significantly less than the proportion of black to white students, and if only black teachers are dismissed. [Citing cases.] Each of these factors is present here.

448 F.2d at 711.

The plaintiff urges here, as in the court below, that she comes within the above-enunciated doctrine of the "prima facie case" [12] upon the facts pleaded.

The defendants challenged the existence upon this record of the conditions precedent to the application of the prima facie doctrine, bringing, as we have noted, a motion for summary judgment under Federal Rule of Civil Procedure 56, and tendering, in support thereof, relevant portions of affidavits, depositions, and answers to interrogatories. The plaintiff, for her part, submitted a Memorandum in opposition to the motion, but neither tendered affidavit nor oral testimony in opposition thereto. Before this court she urges that we must take the well pled allegations of her complaint at their face value, and asserts that a "substantial dispute of fact" exists between the parties, foreclosing summary judg-

ment, because "the Appellee Board denies the Appellant's accusations."

■ The plaintiff is in error. She cannot simply stand on her pleadings as an answer to the motion. The very purpose of the summary judgment procedure is to pierce the veil of the pleadings. Under the 1963 amendments to Rule 56, if, indeed, not before,[13]

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.[14]

Fed.R.Civ.P. 56(e).

The above amendment, Professor Moore writes:

> [W]as declaratory of the sound rule, almost universally subscribed to outside the Third Circuit, that pleadings themselves could not stand in the way of granting an otherwise justified summary judgment. The principle of the amendment should be made effective. And while pleadings are to be construed liberally in favor of the pleader on a motion to dismiss or for judgment on the pleadings, when such a motion is turned into a motion for summary judgment the party opposing summary judgment must normally disclose the merits of his case or defense; and his failure to do so ends his entitlement to the rule of liberally construing the pleadings in his favor. (Footnotes omitted.)

6 J. Moore's Federal Practice § 56.22[2], at 2822 (2d ed. 1974).

---

12. *D. C. Williams v. Matthews Co.,* 499 F.2d 819, 826 (8th Cir.), *cert. denied,* 419 U.S. 1027, 95 S.Ct. 507, 42 L.Ed.2d 302 (1974) and cases therein cited. *Cf. United States v. City of Black Jack, Mo.,* 508 F.2d 1179 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

13. 6 J. Moore's Federal Practice § 56.22[2], at 2820 (2d ed. 1974).

14. Cited and followed in *Jennings v. Davis,* 476 F.2d 1271, 1275–1276 (8th Cir. 1973).

We addressed the point recently in *Willmar Poultry Company et al. v. Morton-Norwich Products, Inc. and Richardson-Merrell, Inc.*, 520 F.2d 289 (8th Cir. 1975), wherein we held, in part,

[S]ummary judgment is always warranted where the party resisting the motion does so by relying solely upon his pleadings and submits no evidence to rebut the moving party's conclusive demonstration of absence of a genuine issue of material fact. Fed.R.Civ.P. 56(e) mandates affirmative action by a party opposing such a motion. Failure to take such action justifies a court in entering summary judgment, * *. (Footnote omitted.)

\* \* \* \* \* \*

Judge Friendly of the Second Circuit has stated the proper procedure for an opposing party under these circumstances:

When the movant comes forward with facts showing that his adversary's case is baseless, the opponent cannot rest on the allegations of the complaint but must adduce factual material which raises a substantial question of the veracity or completeness of the movant's showing or presents countervailing facts. [*Beal v. Lindsay*, 468 F.2d 287, 291 (2d Cir. 1972).]

\* \* \* \* \* \*

Where, as here, a party fails to carry his burden under Rule 56(f), postponement of a ruling on a motion for summary judgment is unjustified. *See School Board of Okaloosa County v. Richardson, supra*, 332 F.Supp. [1263,] at 1269 (D.C.); 6 J. Moore, *Federal Practice* ¶ 56.24 at 2876. *Compare Toebelman v. Missouri-Kansas Pipe Line Co.*, 130 F.2d 1016, 1018, 1022 (3d Cir. 1942).

■ Thus, although we have repeatedly emphasized that summary judgment is an extreme remedy, not to be employed unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances, *Ozark Milling Co., Inc. v. Allied Mills, Inc.*, 480 F.2d 1014 (8th Cir. 1973) and cases therein cited, we recognize as well, its salutary purpose in avoiding a useless, expensive, and time consuming trial where there is no genuine, material fact issue to be tried.

■ But it is not enough to warrant judgment on the motion that the plaintiff before us has not come forward with appropriate response. The movants must nevertheless carry a heavy burden, as above pointed out. What the movants have here shown, essentially, is that out of a total of 16 non-renewed teachers, only 4 were black, the proportion of black teachers was not significantly altered, and the educational qualifications of the plaintiff, in comparison with those hired, were deficient, despite school efforts to aid in their improvement.[15] We are satisfied by clear and convincing evidence on the entire record before us that the Board's actions were nondiscriminatory.[16]

The record does, indeed, disclose conflict between plaintiff and officials in certain areas but we are not unmindful that, as in any other field of human endeavor, "fitness for teaching rests upon a broad range of factors and encompasses numerous personality and character traits."[17] The district court found that such conflicts were not racially inspired and, based upon our consideration of the entire record, we cannot ascribe error to such finding.[18]

**15.** The plaintiff's deficiency in the matter of practice teaching was required to be remedied by her prior to her subsequent employment by the Cairo, Illinois school system.

**16.** *See, e. g., Thomas v. Board of Education of Plum Bayou-Tucker School District No. 1, Wright, Arkansas*, 457 F.2d 1268 (8th Cir. 1972).

**17.** *Smith v. Board of Education of Morrilton School District No. 32*, 365 F.2d 770, 781–782 (8th Cir. 1966).

**18.** Fed.R.Civ.P. 52(a). *See* 9 Wright & Miller, Federal Practice & Procedure, § 2587 at 748 (1971), citing Judge Sanborn in *Pendergrass v. New York Life Ins. Co.*, 181 F.2d 136, 138 (8th Cir. 1950).

A procedural matter remains. Fifteen days prior to trial, the plaintiff, without seeking leave of court, and thus in violation of the Federal Rules of Civil Procedure and of the Local Rules of the District Court [19] attempted to amend her bill of complaint by a modification (Count I) of her original complaint and adding a new Count II invoking the authority of *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). The assertions in Count II were that the District's regulations respecting pregnant school employees discriminated "against plaintiff as a female employee," and that they were unconstitutional. For alleged violations of her constitutional rights she sought both injunctive and monetary relief.

The trial court permitted the amendment embodied in Count I, but denied leave to file Count II on the ground that it "deals with a new cause of action. It being filed two weeks before the trial date, such cannot be allowed filing without doing substantial prejudice and inconvenience to the defendants. In consequence, Count II will not be granted leave to be filed."

Rule 15(a), Federal Rules of Civil Procedure, providing that a federal district court freely give leave to amend pleadings as justice requires is addressed to the sound discretion of the trial court. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (dictum); 3 J. Moore's Federal Practice, ¶¶ 15.02, 15.08 (2d ed. 1974); *Zenith Radio Corp.*

*v. Hazeltine Research*, 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Izaak Walton League v. St. Clair*, 497 F.2d 849, 854 (8th Cir.), *cert. denied*, 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974). Our standard of review thereof goes to the abuse of such discretion. *Reserve Mining Co. v. Environmental Protection Agency et al.*, 514 F.2d 492, 535 (8th Cir. 1975). Here, in the light of the lateness of the hour and the then posture of the case, the district court did not abuse its discretion in disallowing the proposed amendment introducing, as it did, a new cause of action, the contours of which had only recently been enunciated. Her previous pleading of her maternal leave was by way of inducement only. *Weigand v. Afton View Apartments*, 473 F.2d 545 (8th Cir. 1973).

Our review constrains us to paraphrase our observations in *Walton v. Nashville, Arkansas Special School District No. 1*, 401 F.2d 137, 144 (8th Cir. 1968), that those who fail of employment "should not immediately jump to the conclusion that their predicament is necessarily the result of racial considerations. They have every right to demand and to be shown that race is not the criterion by which employment is granted or denied." Such demand has here been met and from the record we gather no more against the defendants than innuendo and implication. That is not enough. Because of her race plaintiff received more consideration, according to the Supervisor of Elementary Education, than the ordinary applicant.[20]

---

**19.** 19 Fed.R.Civ.P. 15(a); Rules of the U. S. District Court for the Eastern District of Missouri 7(c).

**20.** For the school year 1971–1972, our school system had a large number of applications for teaching positions in the elementary education portion of Cape Girardeau School System. If we received an application from a teacher with only a temporary or interim certificate or license from the Department of Education of the State of Missouri, then that applicant would not have received serious consideration for vacancies as we generally had applications for a hundred or so with permanent certification. Thus, on the basis of qualification [illegible] educational background alone, such an applicant would generally not have received consideration. If the applicant was black in view of our formative [affirmative?] action program consideration would have been given to such an application, but with educational deficiencies as revealed by the existence of only a temporary or interim teaching certificate, favorable consideration was very unlikely because of the availability of qualified teachers with permanent lifetime certification.

Affidavit of Vince Raddle, Supervisor of Elementary Education.

3

In the view we have taken of the case we do not reach the matter of the dismissal from the case of Mr. Billy J. Brown, who became a member of the School Board after the action herein complained of had been taken.

Upon a careful review of the entire record, we find no prejudicial error therein. The judgment below is, accordingly,

Affirmed.